**COMPANIA MARITIMA**

v.

**The UNITED STATES.**

**No. 50165.**

United States Court of Claims.

Nov. 7, 1956.

John P. Lipscomb, Jr., Washington, D. C., Frederic P. Lee, Washington, D. C., Allison J. Gibbs, Manila, P. I., and Alfred M. Osgood, Washington, D. C., on the briefs, for plaintiff.

Kendall M. Barnes, Washington, D. C., with whom was George Cochran Doub, Asst. Atty. Gen., Melford O. Cleveland, Wilton, Ala., on the brief, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

LARAMORE, Judge.

The plaintiff is a Philippine corporation which seeks to recover just compensation for two vessels requisitioned from it by the defendant shortly after the outbreak of war between the United States and Japan. At all times material to this case all of the plaintiff's officers and stockholders resided in the Philippine Islands and a majority of the stockholders were Filipino citizens.

Prior to the outbreak of war the plaintiff had operated a fleet of vessels in the vicinity of the Philippine Islands. On

December 21, 1941 (Philippine time), approximately two weeks after the commencement of hostilities, the defendant acting through officers of the United States Navy requisitioned from plaintiff the vessels Monadnock and Sarangani which were anchored near Manila.

On December 24, 1941, the United States forces began evacuating Manila for Bataan and Corregidor Island, and on December 25 or 26, 1941, Manila was declared an open city.

The Japanese forces occupied Manila on January 2, 1942, and on May 7, 1942, all United States and Filipino forces in the Philippines were finally surrendered to the Japanese.

Neither of the two vessels were ever returned to the plaintiff by the defendant and on June 22, 1946, plaintiff filed claims for compensation with the claims office of the United States Navy in Manila. The Navy Contract Settlement Commission determined a value for both vessels and payment was tendered to plaintiff by the Department of the Navy on March 24, 1947. Plaintiff rejected the payment and filed suit in this court on May 25, 1951.

The Government asserts that plaintiff's claim is barred by the 6-year statute of limitations applicable to suits in this court. It takes the position that in Marcos v. United States, 102 F.Supp. 547, 106 F.Supp. 172, 122 Ct.Cl. 641, in which this court held that the war between the United States and Japan suspended the statute as to persons residing in the Philippine Islands, the court erred in selecting September 2, 1945, as the date upon which the suspension was lifted. It urges the court to adopt the date of April 16, 1945, because mail service between Manila and the United States was then resumed and from that date the plaintiff could have communicated with attorneys in the United States and with the Court of Claims.

In the alternative defendant urges that even if the court adheres to its former position that September 2, 1945, is the date on which the court was reopened to plaintiff, we should hold that plaintiff was under a legal disability which was removed on that date and that plaintiff had thereafter only three years in which to file its petition.

In this posture of the case it becomes necessary for the court to review and reconsider the decision in the Marcos case, supra.

The Marcos case was handed down by this court on February 5, 1952. The issues presented in that case are identical, insofar as the statute of limitations is concerned, with the issues involved in the case presently before the court.

The plaintiff in the Marcos case filed his petition on August 14, 1951, alleging that the defendant, acting through the United States Army, had requisitioned a number of cattle from his ranch on the Island of Mindanao in the Philippines during the period from December 9, 1941, to January 28, 1942. The defendant moved, pursuant to rule 16(b), Rules of Court of Claims, 28 U.S.C.A., to dismiss plaintiff's petition on the ground that the claim was barred by the statute of limitations, 28 U.S.C. (Supp. IV) § 2501, 62 Stat. 976, which reads in part as follows:

"Every claim of which the Court of Claims has jurisdiction shall be barred unless the petition thereon is filed, or the claim is referred by the Senate or House of Representatives, or by the head of an executive department within six years after such claim first accrues.

\* \* \* \* \*

"A petition on the claim of a person under legal disability or beyond the seas at the time the claim accrues may be filed within three years after the disability ceases."

The Trading with the Enemy Act of 1917, 40 Stat. 411, as amended, 50 U.S. C.A.Appendix, § 1 et seq., was also in effect at all times pertinent to the plaintiff's claim in the Marcos case. Section 2 of this act defined the word "enemy" as:

"(a) Any individual, partnership, or other body of individuals, of any

nationality, resident within the territory (including that occupied by the military and naval forces) of any nation with which the United States is at war * * *."

Section 3(a) of the act made it unlawful for any person in the United States to trade with an enemy of the United States. The words "to trade" were defined in section 2 as meaning:

"(c) Enter into, carry on, complete, or perform any contract, agreement, or obligation.

\* \* \* \* \*

"(e) To have any form of business or commercial communication or intercourse with."

In its original opinion the court concluded that the outbreak of war between the United States and Japan on December 8, 1941, 50 U.S.C.A.Appendix note preceding section 1, by implication suspended the statute of limitations, and that the suspension was lifted on September 2, 1945, 59 Stat. 1733, giving the plaintiff six full years after that date in which to file his petition. Since, under this view, the filing of the plaintiff's petition was timely, defendant's motion to dismiss was denied.

Judge Whitaker dissented on the ground that since the plaintiff was under a disability to sue, he should have had the same length of time to file his petition after the disability was removed as others under a disability are given by the statute, i. e., three years.

The defendant moved for a rehearing and on July 15, 1952, the court reaffirmed its previous holding 102 F.Supp. 547, 106 F.Supp. 172 at page 122 Ct.Cl. at page 650. In its second opinion, the court held that war is not a legal disability within the meaning of section 2501 of title 28 and that therefore the 3-year period was not applicable.

Judge Whitaker dissented on the ground that the plaintiff was prevented from suing by the Trading with the Enemy Act, supra, and that he was therefore under a legal disability and should

have had only three years in which to bring suit after the war.

After an extensive review of the authorities and a careful reconsideration of the court's opinion in the Marcos case, we are of the opinion that the court was in error in certain respects and we expressly overrule the Marcos case insofar as it conflicts with the views expressed herein.

In the Marcos case the court relied primarily upon Hanger v. Abbott, 6 Wall. 532, 18 L.Ed. 939, to sustain its position that the outbreak of war between the United States and Japan suspended this court's statute of limitations as to persons residing in the Philippine Islands. A careful examination of the Hanger case and the other authorities reveals that they do not support this holding.

It is a well-established rule of international law that war will suspend statutes of limitations *as between citizens of belligerents*. 137 A.L.R. 1455. The courts have applied this rule even though the specific statute involved contained no provision for such suspension. The reason for the rule is that during war international law makes all of the citizens of one belligerent enemies of the Government and the citizens of the other belligerent, forbids all intercourse between citizens of the belligerents, and closes the courts of one belligerent to citizens of the other. Since these principles of international law make it impossible for the citizens of one belligerent to sue in the courts of the other, statutes of limitations are suspended as to such citizens during war.

These principles of international law were applied by the Supreme Court in a number of cases decided subsequent to the Civil War. In those cases the Court held that certain statutes of limitations were suspended during the Civil War as between citizens of the United States and citizens of the Confederacy. A careful analysis of these decisions reveals that they were predicated upon the fact that under international law citizens of the United States were enemies of citi-

zens of the Confederacy and the courts of each belligerent were closed to citizens of the other.

In the leading case of Hanger v. Abbott, supra, a resident of New Hampshire brought suit against a resident of Arkansas in assumpsit. The right to bring suit had matured in October 1859, but suit was not brought until April 1865. Arkansas had a 3-year statute of limitations patterned after the English statute of limitations of 1623 which excepted minors, *femes covert, non compos mentis*, etc., but which made no mention of war. The problem before the court was whether or not the statute continued to run during the Civil War, thus barring the plaintiff's suit. The opinion of the Court contained a lengthy historical discussion which explained why the statute of 1623 and its American antecedents did not include war in the list of exceptions. The Court concluded that the statute was suspended during the Civil War even though it contained no provision for such suspension. The following language appears in the Court's opinion in 6 Wall. at page 539, 18 L.Ed. 939:

> "Total inability on the part of an enemy creditor to sustain any contract in the tribunals of the other belligerent exists during war, but the restoration of peace removes the disability, and opens the doors of the courts. Absolute suspension of the right, and prohibition to exercise it, exist during war by the law of nations, and if so, then it is clear that peace cannot bring with it the remedy if the war is of much duration, unless it also be held that the operation of the statute of limitation is also suspended during the period the creditor is prohibited, by the existence of the war and the law of nations, from enforcing his claim. Neither laches nor fraud can be imputed in such a case, and none of the reasons on which the statute is founded can possibly apply, as the disability to sue becomes absolute by the declaration of war, and is a conclusion of law. Ability

to sue was the status of the creditor when the contract was made, but the effect of war is to suspend the right, not only without any fault on his part, but under circumstances which make it his duty to abstain from any such attempt. His remedy is suspended by the acts of the two governments and by the law of nations, not applicable at the date of the contract, but which comes into operation in consequence of an event over which he has no control."

From the language it appears that the decision of the Court rested mainly upon the fact that the plaintiff was an enemy to whom the courts of the Confederacy were closed under international law or the law of nations. We find no support in the case for the broad rule set out in the Marcos case that the outbreak of war between the United States and Japan by implication suspended this court's statute of limitations to persons in the Philippine Islands. Indeed, the Hanger case was narrowly construed by the Supreme Court in University v. Finch, 18 Wall. 106, at page 110, 21 L.Ed. 818, where the following language appears:

> " * * * That case [Hanger v. Abbott] laid down the proposition that when a citizen of a State adhering during that war to the national cause brought suit afterwards against a citizen residing during the war within the limits of an insurrectionary State, the period during which the plaintiff was prevented from suing by the state of hostilities should be deducted from the time necessary to bar the action under the statute of limitations. It decided nothing more than this. It did not even decide that a similar rule was applicable in a suit brought by the latter against the former. * * * "

In Brown v. Hiatts, 15 Wall. 177, 21 L.Ed. 128, another of the Civil War cases, the Court again considered the problem and held that a 3-year statute of limitations which was in effect in Kansas was suspended during the Civil War

as to a resident of Virginia. The reasons for the suspension were discussed at page 184 of 15 Wall. where the following language appears:

"It is unnecessary to go at length over the grounds upon which the court has repeatedly held that the statutes of limitation of the several States did not run against the right of action of parties during the continuance of the civil war. It is sufficient to state that the war was accompanied by the general incidents of a war between independent nations; that the inhabitants of the Confederate States on the one hand, and of the loyal States on the other, became thereby reciprocally enemies to each other, and were liable to be so treated without reference to their individual dispositions or opinions; that during its continuance all commercial intercourse and correspondence between them were interdicted by principles of public law as well as by express enactments of Congress; that all contracts previously made between them were suspended; and that the courts of each belligerent were closed to the citizens of the other."

In the cases cited above, the Supreme Court held only that since the United States and the Confederacy were belligerents, the courts of one were closed to citizens of the other and statutes of limitation were suspended as between the citizens of the belligerents by international law. We are aware of no case in which the Supreme Court has extended these principles of international law to nonbelligerent nations or powers.

In Poccardi v. Ott, 83 W.Va. 166, 98 S.E. 69, a case decided by the Supreme Court of Appeals of West Virginia, it was held that the principle that statutes of limitation are suspended by the existence of a state of war is not applicable except as between citizens of opposing belligerent states. The court said, 98 S.E. at page 70:

"(2) On the other proposition, involving the existence of a state of war, it is sufficient to answer that the rule or principle invoked is not applicable except as between citizens of opposing belligerent states, and when the courts of the one are closed to the citizens of the other. As the Kingdom of Italy and the Government of the United States of America were not at war between themselves, but were united against a common enemy, the rules of international law so appeared to have no application."

In the light of the authorities we are of the opinion that the court erred in the Marcos case in holding that the outbreak of war between the United States and Japan by implication suspended this court's statute of limitations as to citizens or residents of the Philippine Islands. The Philippine Islands and the United States were allies rather than belligerents and the citizens of the Philippines were not enemies of the United States to whom the courts of this country were closed. Therefore, the rule of international law that war suspends statutes of limitation *as between citizens of belligerents* which was applied by the Supreme Court in the Hanger case was not applicable in the Marcos case nor is it applicable in the case presently before the court.

Although the outbreak of war between the United States and Japan did not have the effect of suspending this court's statute of limitation as to persons in the Philippine Islands, it is the opinion of the court that the plaintiff in the present case was under a legal disability when its cause of action accrued, and remained under this disability until the end of the Japanese occupation of the Philippine Islands.

In this dissenting opinion in the Marcos case, supra, 102 F.Supp. 547, 106 F. Supp. 172 at page 180, 122 Ct.Cl. at page 660, Judge Whitaker expressed the view that the Trading with the Enemy Act, supra, prohibited citizens of the Philippines from suing in the Court of Claims during the war. He based this

view upon section 2 of the act which included in the definition of "enemy" all persons residing in enemy occupied territory, and upon section 3(a) of the act which forbade citizens of the United States to trade with enemies of the United States. The term "to trade" was defined in section 2 of the act to mean, *inter alia,* " 'to have any form of business or commercial communication or intercourse' with." The pertinent parts of the act are quoted above in this opinion.

Since the act made residents of the Philippines "enemies" while the Philippines were occupied by Japanese forces, and since it forbade intercourse between citizens of the United States and its enemies, we conclude that it in effect closed the courts of the United States to persons in the Philippine Islands *during the period in which the Philippines were occupied by the military forces of Japan* and prevented such persons from suing in this court during that time. Thus, since it was the law, i. e., the Trading with the Enemy Act, which prevented persons in the Philippine Islands from suing during the Japanese occupation, we conclude that such persons were under a legal disability while the occupation continued.

Section 2501 of title 28, quoted above in this opinion, provides that a person who is under a legal disability "at the time the claim accrues" has three years to file his petition in this court after the disability ceases. In his dissent in the Marcos case, Judge Whitaker stated that the Trading with the Enemy Act made inhabitants of the Philippine Islands enemy aliens as of December 8, 1941, and placed them under a disability as of that date. We find nothing in the act and nothing promulgated pursuant to the act which specifically supports this date.

In order to determine whether the plaintiff was under a legal disability at the time its cause of action accrued, it is necessary to determine whether it was resident within territory occupied by the enemy on December 21, 1941, the date its property was taken by the defendant. As of that date the military forces of Japan had landed in many parts of the Philippine Islands and were in possession of large areas. Chaotic conditions existed in the Manila area and it is doubtful that any communication, other than military, existed between Manila and the United States. The immediate fall of that city appears to have been inevitable. We believe that the conditions then existing were sufficient to make the territory where the plaintiff was resident "enemy occupied" within the meaning of the Trading with the Enemy Act, and that the plaintiff was therefore under a legal disability when its cause of action accrued.

The plaintiff's disability was removed when the Japanese occupation of the Philippine Islands ended and the courts of this country ceased to be closed to it under the Trading with the Enemy Act. The act contains no criterion for determining when the Japanese occupation ended. We have considered the various dates urged by the parties in the Marcos case and we conclude that September 2, 1945, is the date upon which the plaintiff's disability ceased. Although there is some possibility that the plaintiff might have managed to file a petition in this court at an earlier date, September 2, 1945, is the most logical and practical of the dates suggested. On that date Japan formally surrendered to the United States and there can be no doubt that on that date the Japanese occupation of the Philippines was at a complete end.

Plaintiff had three years after the disability was removed within which to file its petition in this court under section 2501 of title 28. It did not file until May 25, 1951, more than five years after the disability was removed, and its petition will therefore be dismissed.

It is so ordered.

WHITAKER, Judge, and JONES, Chief Judge, concur.

LITTLETON, Judge, with whom MADDEN, Judge, concurs, dissenting:

We cannot agree with the opinion of the majority which overrules our previous opinions in Marcos v. United States, 102 F.Supp. 547, 106 F.Supp. 172, 122 Ct.Cl. 641, and 650, holding that the six-year statute of limitations applicable to suits in this court is suspended where war closes the court to a plaintiff. We adhere to what we held in the Marcos opinion and are still of the opinion that when the Philippine Islands were occupied by Japan, with whom this country was at war, the statute of limitations applicable to the claim of a resident of the Philippine Islands was *suspended* during the period of such Japanese occupation.

The majority opinion herein concedes that war does suspend the running of the statute of limitations where the plaintiff is *a citizen of a belligerent*, but says that the decisions so holding were not intended to apply to citizens or residents of nonbelligerent nations or powers even though those nations were occupied by and completely within the domination and control of a belligerent nation. The ground for this holding by the majority is that while the so-called law of nations, or international law closes the courts of one belligerent country to the citizens of another belligerent country, it is the Trading with the Enemy Act of October 6, 1917, 40 Stat. 411, as amended, which closes the courts of the United States to the citizens or residents of enemy (belligerent) occupied countries, and that because the closing of the courts to such persons is by virtue of local (United States) statute, the plaintiffs are merely under a legal (statutory) disability to sue *in the same manner as an infant or an incompetent.*

It might first be noted that the courts are not closed to a person under a legal disability to sue. Infants or incompetent persons may sue or defend by a guardian, committee, conservator, or other like fiduciary, or by his next friend or guardian *ad litem*. The courts are also open to "persons beyond the seas" because it is always possible for them to retain and communicate with an attorney in the United States. Thus, the clause in the statute of limitations applicable to suits in this court, by persons under the enumerated legal disabilities, does not prevent such persons from suing during the period of the disability, but provides that if they do not do so, they may have an additional three years within which to sue after the disability ceases. The statute also provides that the additional three years is available only where the person was under a disability when the cause of action first accrued. If the cause of action accrues prior to the existence of the disability, the statute runs against persons who later incur any of the enumerated disabilities. This statute has always been strictly construed and persons laboring under such disabilities as sickness, surprise or accident, Kendall v. United States, 107 U.S. 123, 125, 2 S.Ct. 277, 27 L.Ed. 437; ignorance, Green v. United States, 17 Ct. Cl. 174; or inability to truthfully take an oath, Kendall v. United States, supra, Sierra v. United States, 9 Ct.Cl. 224, are not within its coverage.

A person who is a resident of an enemy occupied country in time of war is, it is true, an "enemy" by definition in the Trading with the Enemy Act. So also is a resident of the enemy country itself. Although the so-called law of nations closes the courts of one belligerent to the citizens and residents of the other, the belligerent countries may legislatively declare who is a belligerent or who is an "enemy" in order that those terms may include more than residents of the country on whom war has been declared, and in order that sanctions may be imposed, in the form of fines and imprisonment, on anyone who attempts to "trade" or communicate with such "enemy." We are of the opinion that in the absence of such a statute as the Trading with the Enemy Act, the legally declared state of war between this country and Japan closed the courts of this country to plaintiffs who were resident in the Philippines during the Japanese occupation of that country in the same manner that the courts were closed to

residents of Japan. If the holding of the majority·in this case prevails, it results that a resident of our then enemy, Japan, who had a claim against the United States, had the benefit of the wartime suspension of the statute of limitations and also the benefit of the disability provisions of that statute and might, presumably, elect whichever operated most advantageously in his case. For example, let us assume that his cause of action accrued on the day after his country declared war on the United States. Under the majority's rule herein, the resident of our enemy Japan would have six years less one day within which to bring his suit after the end of the war because he would fall within the majority's definition of a "belligerent". He would also have the option of utilizing the three-year extension to which persons under legal disability to sue are entitled because he was disabled by the Trading with the Enemy Act. Naturally, he would elect to take advantage of the more generous rule. A friendly citizen of the Philippines, on the other hand, whose cause of action accrued one day after his country was taken over by the Japanese, would have only three years within which to bring his suit following the end of the war. We are unable to see that the above results can be reached by any interpretation of the Supreme Court's decision in Hanger v. Abbott, 6 Wall. 532, 18 L.Ed. 939, relied on by the majority. Neither do we think that the Hanger case or the other authorities cited in the Marcos opinion were intended to give the citizens of a United States territory lesser rights than those extended to the citizens of a nation with whom we were at war.

The opinion of the majority holding that a citizen or resident of an enemy-occupied country is under a legal disability to sue in the same manner as an infant, etc., has the effect of incorporating into the statute of limitations an exception not intended or expressed, and despite the court-made exception, the two cannot be treated alike. An infant has two rights under the statute of limitations when his cause of action accrues during infancy. First he may sue through a guardian at any time during the six years after his cause of action accrues. In addition, the saving clause in the statute gives him the right to sue within three years after the removal of his disability. A resident of an enemy-occupied country, on the other hand, whose cause of action accrues after his country has been occupied, may not sue at all while his country is occupied by the enemy and, under the court's ruling, may have only three years after the end of the occupation within which to bring his suit.

Another result of the court's holding is that where a cause of action accrues to a citizen or resident of an enemy occupied country one day *before* his country is occupied, he may lose his right to sue altogether if the occupation lasts more than six years, since a *disability* which occurs *after* a cause of action accrues does not give the plaintiff the benefit of any extension of the time within which to sue. In such a case, a friendly citizen of our territory, the Philippine Islands may not have the benefit of either the rule of the wartime suspension or the benefit of the additional three years within which to sue, while a citizen of a country against whom we have declared war, and whose cause of action accrued *before* the war, would have the benefit of the usual suspension of the statute while the war was going on.

We do not think that Congress intended the words "under legal disability" in the revised statute, 28 U.S.C. § 2501, Supp. IV, to include the situation where war *or war legislation* closes the court to a plaintiff, particularly in view of the fact that persons under legal disabilities, as the term is used in that act, are never in a position where the courts *are closed to them.*

Furthermore, as we pointed out in the Marcos opinion, supra, Section 8(c) of the Trading with the Enemy Act, as amended, after providing that the running of the statute of limitations should

be suspended in certain specified situations, also provides:

"'* * * *  *Provided, however,* That nothing herein contained shall be construed to prevent the suspension of the running of the statute of limitations in all other cases where such suspension would occur under existing law.'"

As noted in the Marcos opinion, Congress, in enacting that provision, had before it a legal memorandum listing the authorities holding that war suspends the operations of the statute of limitations. S.Rept. 111, 65th Cong., 1st Sess., pp. 21, 22; S.Rept. 113, 65th Cong., 1st Sess., pp. 21, 22.

The majority's opinion in the instant case has the effect not only of overruling our opinions in the Marcos case, but it also overrules our holding in the second opinion in Oerlikon Machine Tool Works v. United States, 102 F.Supp. 417, 121 Ct.Cl. 616. In that case the individual plaintiff, Mr. Buehrle, and the partnership, Oerlikon Machine Tool Works, were nationals of Switzerland, which was neither an enemy nor an enemy-occupied country. In January 1942, Mr. Buehrle, and in July 1942, the partnership, were placed on the proclaimed list of certain blocked nationals pursuant to the Trading with the Enemy Act, section 3(a), and General Rule No. 11, 7 F.R. 2168, as amended September 3, 1943, 8 F.R. 12,287. A person on such list was deemed to be an "enemy" within the meaning of the Act and regulations, and the court held that while a person having a claim against the United States was on such proclaimed list, the statute of limitations was suspended under the wartime suspension rule. The defendant's motion to dismiss the petition of Oerlikon was overruled and the case is now being tried on the merits by a commissioner of this court. On the occasion of the second opinion in that case, the court had the benefit of exhaustive briefs on the very point urged in the instant case, i. e., that the closing of the courts to a plaintiff by reason of the Trading with the Enemy Act, or general rulings or regulations issued thereunder, placed such plaintiff under a personal disability similar to that of an infant or incompetent within the meaning of the statute of limitations.

In Salvoni v. Pilson, 86 U.S.App.D.C. 227, 181 F.2d 615, 618, certiorari denied, 339 U.S. 981, 70 S.Ct. 1030, 94 L.Ed. 1385, the plaintiff was an American citizen resident in Italy during the war. In 1948, plaintiff filed a motion to review and extend a judgment entered 14 years previously in 1934. Under the District of Columbia Code no such motion could be filed after the expiration of 12 years. The Circuit Court held that during plaintiff's residence in Italy during the war, the 12-year period of limitations was suspended while communications between the United States and Italy were prohibited:

"* * * The courts are open during a war to one who is in the United States though he be an alien enemy. This was fully discussed and clearly decided in Ex parte Kawato, 1942, 317 U.S. 69, 63 S.Ct. 115, 87 L.Ed. 58. But appellant was not here. She was in enemy country from which and to which intercourse was barred. The courts were not closed to her because of the enemy character which pertained to her at the time but because in fact normal means of access and communication were unavailable due to conditions created by the war and *by the laws then in effect.*" [Italics supplied.]

Italy was, of course, for at least part of the war, a country on whom we had declared war. Later, Italy was invaded by our forces and those of our allies, but a state of war still existed and the Trading with the Enemy Act was applicable to Italy even after the Germans were driven out and the Italians had surrendered. The plaintiff in the Salvoni case resided in Italy until September 15, 1947, when by presidential proclamation the war with Italy was terminated. The court pointed out that her status as an "enemy" arose by virtue of the Trading with the Enemy Act and that by virtue

of that Act she was prevented from communicating with anyone in this country "except in the regular course of mail." The court then stated:

" * * * We take notice of the absence of a regular course of mail between the two countries while at war. Mention should be made also of the provisions of the statute [Trading with the Enemy Act] prohibiting the sending of any communications to an enemy, including, as stated before, a citizen of the United States living in Italy. * * *"

In Chuchuru v. Chutchurru, 10 Cir., 185 F.2d 62, 65, plaintiff was a citizen and resident of the Republic of France. On December 3, 1948, she brought suit against defendant on two promissory notes, one due December 31, 1940 and one due January 1, 1941. The applicable statute of limitations was that of Colorado and provided that all actions on contracts should be commenced within six years of the accrual of the cause of action. After discussing the issue of whether the exemption in the Colorado statute for persons absent from the State applies to a foreigner who was never in this country, the court held that the defendant's plea of the statute of limitations was not well founded because the statute was suspended by operation of the Trading with the Enemy Act which made persons of any nationality residing in enemy occupied country an "enemy" of the United States and one with whom no communication might legally be had:

" * * * On December 11, 1941, Congress declared the existence of a state of war between the United States and the Government of Germany, 55 Stat. 796, 50 U.S.C.A.Appendix, note preceding section 1. France was overrun and occupied by Germany. On November 8, 1942, the Treasury Department by a general ruling promulgated under authorized executive orders declared France to be enemy territory. The Germans were later expelled from France; and on November 4, 1944, such general ruling was amended by deleting therefrom reference to France as enemy territory, as of October 23, 1944. Deducting from the time intermediate the maturity of the notes and the institution of the suit the period during which France was enemy territory, the suit was instituted less than six years after the notes became due. It is the rule of law in the United States that domestic statutes of limitation are suspended as between citizens of countries at war. One of the primary reasons which underly the rule is that the existence of war effectively closes the courts of each belligerent nation to the citizens and residents of the other. Hanger v. Abbott, 6 Wall. 532, 18 L.Ed. 939; Levy v. Stewart, 11 Wall. 244, 20 L.Ed. 86; Ross v. Jones, 22 Wall. 576, 22 L.Ed. 730. "During the time that plaintiff resided in enemy country [actually, enemy occupied], the courts in this country were not within her reach. They were effectively closed to her. She was as completely foreclosed from access to the courts in Colorado as though she were a citizen of Germany, and residing there. For purposes of this case, the statutes of limitation of Colorado were suspended during the time plaintiff was in enemy country. Salvoni v. Pilson, 86 U.S.App.D.C. 227, 181 F.2d 615. With that period deducted, the suit was filed within six years after the cause of action accrued. And therefore it was not barred. Salvoni v. Pilson, supra."

Our decision herein is directly contra the Circuit Court decision in the above case. In both cases the plaintiffs were residents of enemy-occupied countries and their status as "enemies" and their non-access to our courts was by virtue of the Trading with the Enemy Act.

We are of the opinion that the correct rule regarding the wartime suspension of the statute of limitations was stated by this court in the Marcos and the Oerlikon opinions and that the new rule stated in the majority opinion in the instant case is erroneous and contrary to all existing authority.