The JAPANESE WAR NOTES CLAIM-
ANTS ASSOCIATION OF the PHILIP-
PINES, INC. (JAPWANCAP, INC.)

v.

The UNITED STATES.
No. 416-64.

United States Court of Claims.

Feb. 17, 1967.

Edward J. Friedlander, Washington, D. C., with whom was Asst. Atty. Gen. Barefoot Sanders, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

### ON DEFENDANT'S MOTION TO DISMISS AMENDED PETITION

DURFEE, Judge.

On January 3, 1942, the Commander-in-Chief of the Imperial Japanese Forces in the Philippine Islands declared that his army of occupation would henceforth use Japanese military currency as legal tender. Approximately six weeks later, the Filipinos were apprised of this directive and ordered to accept the currency at its face value. Those who refused to obey the order were to be severely punished. During their three years of occupation, the Japanese forces appropriated considerable amounts of personal property, food, and other needed commodities. In return, they gave the Filipinos the bulk of the eleven billion pesos of the aptly nicknamed "Mickey Mouse Currency." While the Japanese remained on the islands, General Douglas MacArthur, the Commander-in-Chief of the Allied Forces in the Southwest Pacific Area, ordered the circulation of several hundred million counterfeit Japanese war notes. This bogus currency was used by the Allied Forces to support United States intelligence agents and the Filipino resistance movement as well as to sabotage and dislocate the economy of the islands during Japanese occupation.[1]

Plaintiff is a Philippine corporation with between 130,000 and 150,000 members, all owning various amounts of both the real and the counterfeit Japanese currency. Their total holdings of 3.5 billion pesos have been deposited in a concrete vault under the custody of the president of plaintiff corporation. Plaintiff

Lawrence C. Moore, Washington, D. C., for plaintiff.

[1]. To facilitate discussion, we assume that the factual allegations in the petition are true. Guessefeldt v. McGrath, 342 U.S. 308, 310, 72 S.Ct. 338, 96 L.Ed. 342 (1952); United States v. New Wrinkle, Inc., 342 U.S. 371, 373, 72 S.Ct. 350, 96 L.Ed. 417 (1952).

filed its petition in this court on December 15, 1964. The petition seeks: (1) reimbursement for the counterfeit money in its possession, (2) redemption by the United States of the Japanese-issued war notes, and (3) payment by the United States of its claims against Japan for the loss of human life and physical destruction. The damages sought total slightly under ten billion dollars.

## I

■■■ This court lacks jurisdiction to hear a claim that is not filed "within six years after such claim first accrues." 28 U.S.C. § 2501; Soriano v. United States, 352 U.S. 270, 273–274, 77 S.Ct. 269, 1 L.Ed.2d 306 (1957). A claim first accrues when all the events have occurred which fix the alleged liability of the United States and entitle the claimant to institute an action.[2] For its claim to be timely, plaintiff must show that events which directly affect the rights asserted in this suit took place after December 15, 1958, or within six years prior to the filing of this petition. Baer v. United States, 164 Ct.Cl. 447, 450, cert. den. 379 U.S. 878, 85 S.Ct. 145, 13 L.Ed.2d 86 (1964). See, also, United States v. Dickinson, 331 U.S. 745, 749, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947); Klein v. United States, 152 Ct.Cl. 221, cert. den. 366 U.S. 936, 81 S.Ct. 1661, 6 L.Ed.2d 847 (1961).

■■■ The facts demonstrate that the accrual date was prior to December 14, 1958. The Japanese occupation of the Philippines formally ended on September 2, 1945. 59 Stat. 1733; Compania Maritima v. United States, 145 F.Supp. 935, 136 Ct.Cl. 697, 706 (1956); Marcos v. United States, 102 F.Supp. 547, 122 Ct.Cl. 641 (1952). At that time the

Japanese mandate requiring acceptance of the currency lost all force as the Filipinos no longer had to fear punishment for refusing the war notes. Since no evidence has been presented arguing that the distribution halted at any other time, this date is the logical one for determining when the Japanese and the Americans quit circulating both the real and the counterfeit money. Plaintiff bases its claims for United States indemnification of its rights against Japan on the Treaty of Peace between the Allied Powers and Japan.[3] The proclamation of the treaty was on April 28, 1952. At this time, plaintiff's rights under the treaty became fixed inasmuch as there existed only an indefinite possibility that events would take place which would alter the treaty and concomitantly plaintiff's rights under it. As this court said in Baer v. United States, supra, 164 Ct.Cl. at p. 451:

> * * * The bare possibility that some future international settlement—conceivably, decades in the future—*might* authorize plaintiff to collect his debt in full could not postpone the accrual of so specific a claim of present deprivation. This case is wholly unlike the *Dickinson* and comparable cases in which the course of future events could reasonably be expected to have a direct effect on the claimant's rights. Here the future circumstance on which the plaintiff relies was a mere indefinite possibility which was too slight to arrest the accrual of the claim (if one existed).

## II

■■■ In certain instances the running of the statute will be suspended when an accrual date has been ascer-

2. Nager Electric Co., Inc., and Keystone Engineering Corp. v. United States, 368 F.2d 847, 851–852, 177 Ct.Cl. —— (1966), and cases cited therein. See also, Developments in the Law—Statutes of Limitations, 63 Harv.L.Rev. 1177, 1201 (1950).

3. It alleges that the U. S. assumed all claims against Japan by virtue of Article 14(b) of the Treaty:

"Except as otherwise provides in the present Treaty, the Allied Powers waive all reparation claims of the Allied Powers, other claims of the Allied Powers and their nationals arising out of any actions taken by Japan and its nationals in the course of the prosecution of the war, and claims of the Allied Powers for direct military costs of occupation."

tained, but plaintiff does not know of his claim. Ignorance of rights which should be known is not enough. Art Center School v. United States, 142 F.Supp. 916, 921, 136 Ct.Cl. 218, 227 (1956); Thomas v. United States, 125 Ct.Cl. 76, 80 (1953); Dion v. United States, 137 Ct. Cl. 166 (1956); Navajo Freight Lines, Inc. v. United States, 176 Ct.Cl. (No. 316–63), (Decided July 15, 1966). Plaintiff must either show that defendant has concealed its acts with the result that plaintiff was unaware of their existence or it must show that its injury was "inherently unknowable" [4] at the accrual date. An example of the latter would be when defendant delivers the wrong type of fruit tree to plaintiff and the wrong cannot be determined until the tree bears fruit. See 1 Williston on Sales, § 212(a) (Rev. ed. 1948). In this situation the statute will not begin to run until plaintiff learns or reasonably should have learned of his cause of action. Dawson, Fraudulent Concealment and Statutes of Limitations, 31 Mich.L.Rev. 875 (1933); Harv. L. Rev. supra. But cf. Pickett v. Aglinsky, 110 F.2d 628 (4 Cir. 1940); Kennedy v. Johns-Manville Sales Corp., 135 Conn. 176, 62 A.2d 771 (1948).

■■■ Plaintiff makes no argument that the peace treaty with Japan was either concealed by defendant or "inherently unknowable" until a date later than the accrual of its cause of action. With regard to the counterfeit currency, it asserts that defendant withheld information and that it was not possible for it to know of the counterfeiting until 1964. Once the statute of limitations has been tolled, it is not necessary that plaintiff obtain a thorough understanding of all the facts to halt the suspension. Defendant is not required to wait until plaintiff has started substantiating its claims by the discovery of evidence. Once plaintiff is on inquiry that it has a

potential claim, the statute can start to run. See, Mich.L.Rev. supra, at 912. This standard is in line with the modern philosophy of pleading which has reduced the requirements of the petition and left for discovery and other pretrial procedures the opportunity to flesh out claims and to define more narrowly the disputed facts and issues. See Ct.Cl. Rules 13–18, 38–46.[5]

■■■ Assuming ad arguendo that either defendant concealed the counterfeiting or that it was "inherently unknowable," we find from the following that plaintiff was on inquiry that its cause of action existed at a date prior to six years before it filed its petition.

In 1946, the Britannica Year Book stated at pp. 572–573:

* * * Finances were in a chaotic condition due to the various currencies in use. The Japanese during their three and one-half years of occupation, had printed billions of dollars of worthless paper money which was widely circulated and used for all business purposes. This condition was accentuated by the issuance of millions of pesos through guerilla organizations to maintain fighting units so vital to the ultimate success of the U.S. The issuance of this currency was authorized by the U.S. Army.

In the following year, reference was made to the bogus currency in a leading financial journal:

* * * The position of the Filipinos seems to be bolstered by the fact that the Australian and American Governments had also printed about 30 million of the Mickey Mouse for use by their agents in the islands during the occupation. The American and Australian-printed Mickey Mouse also contributed to the inflation, and the Filipino people can hardly be penalized

4. Urie v. Thompson, 337 U.S. 163, 169, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949).

5. See, also, Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); Dioguardi v. Durning, 139 F.2d 774 (2 Cir. 1944); Nagler v. Admiral Corp.,

248 F.2d 319 (2 Cir. 1957); 1a Barron and Holtzoff Federal Practice and Procedure § 255 (Wright ed.). But cf. McCaskill, The Modern Philosophy of Pleading—A Dialogue Outside the Shades. 39 ABAJ 123 (1952).

for its use of that currency. Ortigas, "Aftermath of Japanese Currency in Philippines." 165 The Commercial and Financial Chronicle 1378, 1407, Col. 3 (March 3, 1947).

On December 10, 1952, the President of plaintiff corporation wrote the following to Mrs. Franklin D. Roosevelt:

Since the United States Government cannot deny that General MacArthur has also falsified the "Japanese Currency," America should be the first to initiate this act of "Goodwill" towards her ally, not only as a reward but as a token and in recognition of our sufferings and all the things we have lost due to those War Notes which was [sic] paid in exchange of our properties, animals and plants thus making us destitutes and hungry and poor as a beggar this being the only chance whereby our families could survive.

A letter of similar content, but of greater length was mailed on the same date to the President of the General Assembly of the United Nations.

In conclusion, we hold that plaintiff's cause of action accrued at a date more than six years prior to its instituting suit in this court. Therefore, plaintiff's claim is time-barred and outside this court's jurisdiction. Defendant's motion is granted, and the amended petition is dismissed.