847 F.2d 779
 William HOHRI; Hannah Takagi Holmes; Chizuko Omori, Ind.
and Rep. for Haruko Omori; Midori Kimura; Merry Omori;
John Omori, Ind. and Rep. for Juro Omori; Gladyce Sumida;
Kyoshiro Tokunaga; Tom Nakao; Harry Ueno; Edward Tokeshi;
Rentaro Hashimoto; Nelson Kitsuse, Ind. and Rep. for
Takeshi Kitsuse; Eddie Sato; Sam Ozaki, Ind. and Rep. for
Kyujiro Ozaki; Kumao Toda, Ind. and Rep. for Suketaro Toda;
Kaz Oshiki; George R. Ikeda; Tim Takayoshi; Cathy
Takayoshi; National Council for Japanese Amer. Redress,
Plaintiffs-Appellants,
v.
The UNITED STATES of America, Defendant-Appellee.
 No. 87-1635.
 United States Court of Appeals,
Federal Circuit.
 May 11, 1988.
 
 Appealed from: U.S. District Court for the District of Columbia; Oberdorfer, Judge.
 Benjamin L. Zelenko, Landis, Cohen, Rauh and Zelenko, Washington, D.C., argued for plaintiffs-appellants. With him on the brief were B. Michael Rauh and Martin Shulman.
 Jay S. Bybee, Dept. of Justice, Washington, D.C., argued for defendant-appellee. With him on the brief were Richard K. Willard, Asst. Atty. Gen., Joseph E. diGenova, U.S. Atty., Jeffrey Axelrad, Director, Torts Branch and Barbara L. Herwig.
 Before RICH and NIES, Circuit Judges, and BALDWIN, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 This appeal comes to this court following the decision of the Supreme Court in United States v. Hohri, 482 U.S. ----, 107 S.Ct. 2246, 96 L.Ed.2d 51 (1987) (vacating judgment of District of Columbia Circuit and remanding with instructions to transfer to this court pursuant to 28 U.S.C. Sec. 1631 (1982)). In Hohri, the Supreme Court held that a case which presents both a nontax claim under the "Little Tucker Act," 28 U.S.C. Sec. 1346(a)(2) (1982), and a claim under the Federal Tort Claims Act, 28 U.S.C. Sec. 1346(b) (1982), as here, may be appealed only to the Court of Appeals for the Federal Circuit.
 
 
 2
 The appeal here is from the judgment of the United States District Court for the District of Columbia, 586 F.Supp. 769 (D.D.C.1984) (Oberdorfer, J.), dismissing the claims of nineteen individuals and an organization of Japanese-Americans which sought damages and declaratory relief for injuries resulting from the internment of Japanese-Americans during World War II. The district court held, inter alia, that appellants' claims were barred by applicable statutes of limitations.
 
 
 3
 Each of the numerous issues raised to this court is fully addressed in the opinion of Judge Oberdorfer. After a meticulous review of that opinion, we are unpersuaded of any error. We see no need to restate or elaborate on the district court's careful and scholarly analysis, nor to burden appellants with further delay. Accordingly, we affirm for the reasons stated in the district court opinion.
 
 
 4
 AFFIRMED.
 
 
 5
 BALDWIN, Senior Circuit Judge, dissenting-in-part.
 
 
 6
 The majority adopts, in toto, the District Court's opinion, Hohri v. United States, 586 F.Supp. 769 (D.D.C.1984). Although I agree with much of what the trial judge says, I respectfully dissent because I believe he erred in concluding that appellants' takings claims are barred by the statute of limitations.
 
 
 7
 Appellants' claims are dismissed under rule 12(b)(1), for lack of subject matter jurisdiction. In reviewing a dismissal under this rule, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). Even if it "appear[s] on the face of the pleadings that a recovery is very remote and unlikely," id., the motion should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Id. quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). Thus, in reviewing the trial judge's decision, this court is obliged to review independently his application of the law to the undisputed facts in the historical record and the pleadings.[1]
 
 
 8
 The trial judge correctly determined that appellants had stated a takings claim, and that the portion of appellants' takings claims concerning constitutional rights other than property rights were unfounded. 586 F.Supp. at 783. I believe, however, that the trial judge incorrectly decided that appellants' remaining takings claims were barred by the applicable six year statute of limitations. 28 U.S.C. Sec. 2401(a) (1982).[2] The trial judge rejected appellants' contention that the statute of limitations was tolled as a result of the government's fraudulent concealment of information relating to the military necessity for relocating and interning Japanese-Americans during World War II. 586 F.Supp. at 786-91. Instead, he found that appellants failed to exercise due diligence in asserting their claims. Id. at 790-91. He found that a reasonably diligent plaintiff would have discovered sufficient evidence to state a claim as early as the late 1940's. Id. I cannot agree that the government's fraudulent concealment of vital information did not toll the statute.
 
 
 9
 The statute of limitations to which appellants' claims are subject is enumerated in 28 U.S.C. Sec. 2401(a) (1982):
 
 
 10
 Every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues. [Emphasis added]
 
 
 11
 The question, therefore, is when appellants' right of action first "accrued." The trial judge decided that appellants' claims accrued, at the latest, some time in the late 1940's, following publication of the Ringle, Fly, and Hoover documents. 586 F.Supp. at 790.
 
 
 12
 As a general rule, a statute of limitations is tolled where a defendant fraudulently or deliberately conceals material facts relevant to a plaintiff's claim, Holmberg v. Armbrecht, 327 U.S. 392, 396, 66 S.Ct. 582, 584, 90 L.Ed. 743 (1946); Korody-Colyer Corp. v. General Motors Corp., 828 F.2d 1572, 1576-78 (Fed.Cir.1987); cf. Albert v. Kevex Corp., 729 F.2d 757, 763 (Fed.Cir.1984), provided the plaintiff could not, through the exercise of due diligence, have discovered the basis of the claim. Holmberg, 327 U.S. at 397, 66 S.Ct. at 585. This doctrine is as applicable to the United States as to any defendant. See Welcker v. United States, 752 F.2d 1577, 1580 (Fed.Cir.1985); Japanese War Notes Claimants Ass'n of the Philippines, Inc. v. United States, 373 F.2d 356, 178 Ct.Cl. 630, cert. denied, 389 U.S. 971, 88 S.Ct. 466, 19 L.Ed.2d 461 (1967). As the trial judge pointed out, 586 F.Supp. at 787-88, the parties do not dispute that appellee concealed various intelligence reports which contradicted the claim of military necessity raised in Hirabayashi and Korematsu. The parties do dispute, however, the effect this concealment had on the accrual of appellants' claims, and the duration of the effective concealment of sufficient matter to delay such accrual.
 
 
 13
 Appellants argue that their claims did not accrue until the completion of work by the Commission on Wartime Relocation and Internment of Civilians (CWRIC), established by Pub.L. No. 96-317, 94 Stat. 964, 96th Cong., 2d Sess. (1980), and the publication of the CWRIC Report of its investigations entitled Personal Justice Denied in 1982. Appellants' position is that the Supreme Court erected an insurmountable legal barrier with its decisions in Hirabayashi v. United States, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943) and Korematsu v. United States, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944), when it upheld the internment policy in deference to the military. This barrier could be removed they assert only by an affirmative statement by one of the "war-making" branches that military necessity did not require the internment policy. They argue that the creation of CWRIC and the publication of Personal Justice Denied is the first event constituting such a statement. This conclusion is premised upon the disclosure in Personal Justice Denied that the government fraudulently concealed significant and vital information concerning its role in the Korematsu and Hirabayashi decisions. Appellants say that this fraudulent behavior precluded them from seeking relief in the courts because the level of deference shown by the Supreme Court in Korematsu and Hirabayashi to military decision making rendered any claim virtually frivolous. Thus, the statute of limitations should, they assert, be tolled until 1980 or 1982.
 
 
 14
 In opposition, appellee asserts that appellants' claims accrued at the time of the taking because that is when appellants knew of the injury and its cause. In the alternative, appellee argues appellants' claims accrued at one of several later dates: (1) when the Ringle, Fly, and Hoover documents first appeared; (2) when other books about the interning of Japanese-Americans appeared in the 1950's; or (3) at the latest, when President Ford signed Presidential Proclamation 4417 in 1976 declaring the incident a "mistake." The basis for this position is that the facts concealed concerned a potential affirmative defense of military necessity and not the appellants' cause of action. This is, as the trial judge realized, a mere technical distinction, 586 F.Supp. at 787, especially where, as here, the Supreme Court sanctioned this affirmative defense as a bar to cases questioning the propriety of the internment policy. Korematsu, 323 U.S. at 218, 65 S.Ct. at 195, quoting Hirabayashi, 320 U.S. at 99, 63 S.Ct. at 1385, ("We cannot say that the war-making branches of the Government did not have ground for believing that in a critical hour such persons could not readily be isolated and separately dealt with, and constituted a menace to the national defense and safety, which demanded that prompt and adequate measures be taken to guard against it.").[3] Appellee's assessment of the impact of Hirabayashi and Korematsu is a faulty one. These cases had the effect of validating the exclusion orders in toto as compelled by military necessity. 323 U.S. at 218, 65 S.Ct. at 195. Appellee's suggestion that the holding in Ex Parte Kawato, 317 U.S. 69, 78, 63 S.Ct. 115, 120, 87 L.Ed. 58 (1942) permitting nonresident aliens of Japanese ancestry to prosecute civil suits opened the court doors is misplaced in this case.[4] The courthouse door was not closed to these appellants in the manner at issue in Kawato. Rather, here the courts were effectively closed by the Supreme Court to evacuated and interned Japanese-Americans to challenge the validity of the exclusion orders. The Supreme Court's decision to defer to military authorities was constitutionally based. Even though it stated in Korematsu that racial classifications were "immediately suspect," the Court left little room for judicial evaluation of the propriety of the orders when it agreed with its earlier position in Hirabayashi that the authority vested in the military by the exclusion orders was "not wholly beyond the limits of the Constitution," 320 U.S. at 101-02, 63 S.Ct. at 1386, and that "Congress, and the military authorities acting with its authorization, have constitutional power to appraise the danger in the light of facts of public notoriety." 323 U.S. at 218. Once the courthouse doors were effectively closed, it did not matter that appellants knew of the existence of their injury and the identity of the defendant.[5] Appellants may have been on notice to inquire, but this knowledge left them in no better position where the available information and Supreme Court decisions precluded them from filing a good faith claim.
 
 
 15
 This court's decisions in Welcker, supra, Braude v. U.S., 585 F.2d 1049, 218 Cl.Ct. 270 (1978), and Japanese War Notes Claimants Ass'n, supra, are not to the contrary. None of those cases included a prior judicial determination which resulted from the defendant's fraudulent conduct. These appellants' claims were effectively foreclosed by Hirabayashi and Korematsu as a direct result of appellee's conduct.
 
 
 16
 Where a defendant fraudulently conceals information, and that concealment has the effect of dooming a plaintiff's claims at the outset, the statute of limitations should be tolled until such time as the plaintiff discovers or should have discovered, through due diligence, the facts concealed. Under this standard, it would not matter whether the information concealed went to a claim or an affirmative defense. If it can be said that a plaintiff's claim would not survive a motion to dismiss on the pleadings because the defendant fraudulently concealed information relevant to an essential element of the claim, I would find the statute tolled until such time as a plaintiff, exercising due diligence, could discover the information.
 
 
 17
 Appellee's actions during the War clearly constituted fraudulent concealment. The district court found, based on the pleadings and the historical evidence, that appellee did, in fact, conceal critical evidence during the prosecution of Hirabayashi and Korematsu before the Supreme Court. 586 F.Supp. at 787-88. But the court found that once the Hoover, Fly, and Ringle documents, all objects of concealment, were leaked, the statute began to run. Id. I disagree that these documents were sufficient to rebut the presumption of military deference provided by the Supreme Court in Hirabayashi and Korematsu. These documents constituted only a small portion of the information concealed, and by no means the most important information.
 
 
 18
 The Supreme Court was not without contradictory assertions in Hirabayashi and Korematsu. The Japanese-American Citizens League (JACL) included in its amicus brief in Korematsu statements by the Attorney General and the Secretary of War (and even by President Roosevelt himself) made in 1941 and 1942 that indicated the west coast was not under any serious threat of invasion. JACL Brief at 82-87. Thus, in deferring to the military evaluation of the situation, the Court must have recognized that the military judgment was one reached after weighing the relevant alternatives. The leaked documents merely provided opinions of certain military intelligence officers. It is likely that the Court would have been unwilling to decide whether these reports were sufficient to rebut the decision reached where it was represented that no other information existed to the contrary. The Court specifically refused to delve into the military's reasoning. Korematsu, 323 U.S. 218-19, 65 S.Ct. at 195. It is equally likely that, with the information available, any complaint filed by appellants would have resulted in dismissal because of the Supreme Court's mandated deference to the military authorities on the issue. It does not, to me, require much imagination to realize that without the military necessity argument the Supreme Court would not have permitted the exclusion and internment orders to go forward. Thus, the leaking of the Fly, Ringle, and Hoover documents should not have been held sufficient to start the clock, and the statute should have remained tolled until a later date.
 
 
 19
 The statute having been tolled by appellee's fraudulent concealment, the question remaining is when did it begin to run? The traditional standard applied by this court is that appellants "must either show that [appellee] has concealed its acts with the result that [appellants were] unaware of their existence or [appellants] must show that [their] injury was 'inherently unknowable' at the accrual date." Welcker, 752 F.2d at 1580, quoting Japanese War Notes Claimants Ass'n, 373 F.2d at 359. Generally, it would be sufficient that appellants were on notice to inquire that they had a potential claim, id., and it is "irrelevant for limitations purposes that [appellants did not] learn[ ] until later that [they] had further support for [their] decision." 752 F.2d at 1582 (emphasis in original).
 
 
 20
 Strict application of this rule without regard for appellants' peculiar circumstance would yield the result reached by the trial court and majority. Appellants were readily aware that their property had been taken at the time they were excluded and interned. There was no question as to who had committed the acts against them. According to the trial court, the only obstacle in their way was a pair of Supreme Court decisions upholding appellee's actions and granting complete deference to the military's judgment. Under this logic, appellants, had they acted with due diligence, should have filed their claims in the forties or fifties. At that time, however, with the information available, they were destined for dismissal on the pleadings.
 
 
 21
 Application of this rule in appellants' situation is, I believe, inappropriate and inequitable. Instead, I would judge appellants' diligence according to whether they acted reasonably under the circumstances. Our decisions suggest holding that appellants had knowledge of their claims when they were on notice to inquire about their potential claims. Welcker, supra. In a situation such as this, this standard should be applied in such a way that appellants are not barred until such time as they were able to obtain sufficient knowledge of the factual basis of their claims to allow them to file a good faith complaint.[6] Before the statute could begin to run against appellants, there had to be sufficient evidence in the public domain to permit appellants to state a claim. In the peculiar facts of this case, this means that appellants needed enough facts to potentially rebut the Supreme Court's presumption of deference. Thus, the evidence concealed by appellee must have been sufficient to provide appellants with enough facts to make a good faith determination that they could potentially rebut this presumption. The leaked documents, as noted earlier, could not suffice to defeat the presumption erected. It was not until CWRIC exposed and declassified a wealth of intelligence information that appellants became aware of the existence of adequate facts indicating that sufficient concealment had occurred to cast sincere doubt upon the Supreme Court's Hirabayashi and Korematsu holdings.
 
 
 22
 The additional information was available to the Justice Department at the time it prepared the briefs in those cases. Appellee did not present evidence indicating that appellants should have, or could have, known of the existence of this additional information solely because of the presumed knowledge of the Ringle, Fly, and Hoover documents. There were only two means for appellants to obtain this information: (1) by Executive declassification;[7] or (2) by Act of Congress. In this case, the latter occurred before the former.
 
 
 23
 The act creating CWRIC, Pub.L. No. 96-317, 94 Stat. 964 (1980) supports this reasoning. Section 2(a)(3) states that "no sufficient inquiry has been made" into the exclusion and internment. Section 2(b)(1) says one of the purposes of the Act was to "review the facts and circumstances surrounding" the exclusion and internment. This was the first intimation by any branch of the government that the Court's deference to the military was legally erroneous and possibly subject to attack. Prior statements simply noted the immorality of the actions. See, e.g., Presidential Proclamation No. 4417 (1976); H.R.Rep. No. 732, 80th Cong., 1st Sess. (1947) (Report accompanying the American-Japanese Evacuation Claims Act stating that the "only clear recourse" for the victims was through private bills, suggesting that the evacuees could not state an actionable claim); S.Rep. No. 601, 82d Cong., 1st Sess. (1951) and H.R.Rep. No. 496, 82nd Cong., 1st Sess. (1951) (amendments to same act restating same view); H.R.Rep. No. 1809, 84th Cong., 2d Sess. (1956) (amendments to same act referencing earlier legislative history). In fact, the reports mentioned at various points that Congress did not believe appellants suffered any actionable wrongs. See H.R.Rep. No. 496, supra, at 2-3.
 
 
 24
 The Attorney General concurred in this assessment. As the official charged with administering the American-Japanese Evacuation Claims Act, the Attorney General in the case of Claim of Mary Sogawa, 1 Adjudications of the Att'y Gen. 126 (Dec. 20, 1950) stated that his decision to reject a claim for certain expenses of preparing for and returning after the evacuation was premised on his belief that the Act did not acknowledge that the evacuees suffered an actionable wrong. His opinion stated that the Act's legislative history made it clear that the Act "was intended to be an act of bounty," and that "in the teeth of the decision of the Supreme Court in the Korematsu case" the evacuation could not be characterized as "constitut[ing] a legal wrong." Id. at 134 (emphasis added).
 
 
 25
 These Congressional and Executive statements evince a general assumption that the Hirabayashi and Korematsu decisions barred civil as well as criminal actions by appellants. Thus, it is difficult for me to agree with the trial court's result and the majority's affirmance which suggest that appellants should not have been deterred by those decisions from filing a good faith complaint. Rather, if the prevailing presumption in the war making branches was the belief that appellants did not have a cognizable claim, it is eminently reasonable that appellants felt the same way. The issue should be, as I suggested earlier, whether appellants were reasonable in their determination that they could not state a cognizable claim, not whether appellants were absolutely certain they had no claim. During a time of heightened awareness of unsubstantiated claims, I am hesitant to impose upon appellants a standard stiffer than reasonableness. I would hold, therefore, that appellants acted reasonably in failing to bring their claims with only the Ringle, Fly, and Hoover documents to support their position, and no clear indication that further information had been fraudulently concealed from the Supreme Court. I would find that the statute of limitations for appellants' takings claims was tolled until the issuance of the CWRIC Report, Personal Justice Denied, or, at the earliest, at the time when the information in the Report became public.
 
 
 26
 Having found appellants' takings claim timely, I would, nonetheless, not permit all takings claims. Specifically, I would reject claims brought by members of appellants' class who earlier recovered under the American-Japanese Claims Act, 50 U.S.C.App. Secs. 1981-1987 (1982). Section 1984(d) of that Act states that "the payment of an award shall be final and conclusive for all purposes, * * * and shall be a full discharge of the United States and all of its officers, agents, servants, and employees with respect to all claims arising out of same subject matter." (Emphasis added). The subject matter to which the provision refers is the "evacuation or exclusion" of Japanese-Americans. Id. at Sec. 1981(a). This statute presented appellants with a clear choice, litigation of their rights versus the "bounty" offered.
 
 
 27
 It is unnecessary to consider whether this statute may have constituted an exclusive remedy for the wrongs committed here, because the language of Sec. 1984(d) specifically states that "full discharge" occurs only upon "payment of an award." Thus, it would be unreasonable to restrict access to the federal courts for those appellants who did not receive a payment under that Act. The clear language of the statute indicates that merely bringing a claim is not enough to execute a full discharge, thus it also is unnecessary to consider whether Congress acted beyond its power in forcing appellants to choose between a court case and an administrative "settlement." Clearly Congress' offer was made in good faith, and thus appellee should not be estopped from raising Sec. 1984(d) against those appellants who received a "payment" under the Act. See Heckler v. Community Health Services of Crawford County, Inc., 467 U.S. 51, 61, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984) (assertion of estoppel against the government requires, at a minimum, a demonstration "that the traditional elements of an estoppel are present," saving for a later time whether estoppel can ever apply to the government). However, the remaining appellants should be permitted to raise their takings claims.
 
 
 28
 Our nation has evolved tremendously since the incidents which gave rise to this action occurred. So, too, our government institutions have matured since that time. Unfortunately, we have not yet erased the possibility of abuse of individual citizens or groups of citizens. Fortunately, we have adequate means in our laws and our Constitution for those harmed by governmental actions to seek recompense in the courts. While the statute of limitations seeks justly to protect the United States from endless claims that may be age old, it does not behoove our society to sanction the perpetration of fraud by the sovereign. Appellants are, I believe, entitled to their day in court to attempt to prove their allegations that their property was taken, and that they are entitled to relief for that taking. Whether they will succeed is irrelevant at this point. In my opinion, appellee's actions before this nation's highest Court, and its long concealment of the factual basis of appellants' claims entitles appellants to the opportunity to try. I would therefore reverse that portion of the trial judge's opinion dismissing the takings clause claims for those appellants who did not receive payment under the American-Japanese Evacuation Claims Act.
 
 
 
 [1]
 The Supreme Court settled long ago that a district court judge may inquire, through affidavits or otherwise, into the facts as they exist when a question of the court's jurisdiction is raised. See Land v. Dollar, 330 U.S. 731, 735 and n. 4, 67 S.Ct. 1009, 1011 and n. 4, 91 L.Ed. 1209 (1947)
 
 
 [2]
 The trial judge felt it unnecessary to decide the exclusivity of the American-Japanese Evacuation Claims Act, 50 U.S.C.App. Secs. 1981-1987. As discussed, infra, this Act's exclusivity provision applies to those in appellants' class who have received a payment under the Act, but does not act to bar the takings claims of those who did not recover under it
 
 
 [3]
 Appellee's argument (Brief of Appellee at 30-31) that subsequent Supreme Court cases opened the door to appellants' claims is unconvincing. The cases cited by the government deal with different situations and statutes unrelated to appellants' internment and exclusion
 
 
 [4]
 Appellee seeks to lump these Japanese-Americans with all other Japanese-Americans affected by the war who obtained some relief. Aside from the insensitivity to appellants' treatment this position evinces, the suggestion fails to distinguish between those Japanese-Americans affected by the exclusion and internment orders, and other Japanese-Americans affected by distinct acts of Congress
 
 
 [5]
 United States v. Kubrick, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979) is not to the contrary. Kubrick addressed when a cause of action accrues where no fraudulent concealment has been alleged. At least two appeals courts have rejected extending Kubrick to cases where fraudulent concealment is alleged. Arvayo v. United States, 766 F.2d 1416, 1422 (10th Cir.1985); Barrett v. United States, 689 F.2d 324, 328-30 (2d Cir.1982). Compare Premium Management, Inc. v. Walker, 648 F.2d 778, 783 n. 7 (1st Cir.1981) (dicta suggesting Kubrick might apply to cases turning on fraudulent concealment)
 
 
 [6]
 The filing of frivolous claims (and appeals) is a serious matter in today's judicial system. Rule 11 of the Federal Rules of Civil Procedure has evolved into a strong judicial weapon against claims which do not have a good faith basis. With the emphasis on developing a good faith basis for complaints before they are filed (and the concomitant distaste for using discovery for unknowing fishing expeditions) it is ironic that the standard for tolling the statute of limitations does not include Rule 11's principles. Forcing claimants to file a suit which may be subject to Rule 11 sanctions [or is likely to be dismissed on the pleadings] to beat a statute of limitations defense is not sound judicial policy. Even though Rule 11 did not have the bite it now has in the 1940s and 1950s, appellants should not be penalized for failure to file a timely claim which could not then be substantiated
 
 
 [7]
 It is unnecessary to consider whether a Freedom of Information Act request would have yielded these documents, although it is unlikely because of their continued classification, because appellee made no showing that appellants should have known of their existence