Littleton, Judge,
delivered the opinion of the court:
Plaintiff insists that the facts in this case require the court to hold (1) that there was a constructive taking by the defendant either of the fee of the entire property of plaintiff, or a part thereof, or of a right therein, such as an easement of overflow or of slope; or (2) that the defendant is liable to plaintiff for loss and damage sustained by it by reason of dredging operations performed pursuant to an Act of Congress and that, in either case, the measure of the amount recoverable is the same.
We are of opinion that plaintiff is not entitled to recover for the reason that there was no taking by the defendant, constructive or otherwise, of plaintiff’s property, and that any damage which may have resulted to plaintiff’s property through the failure of its bulkhead, to which failure the *226 defendant’s authorized dredging operations may have contributed; was indirect and consequential to the exercise by the defendant of its lawful right in maintaining a navigable waterway.
The plaintiff company was incorporated in 1925 and in April 1933 acquired title to the property in question, which consisted of a coal yard and certain equipment elevated considerably above the water surface of the Harlem River and supported along the edge of the waterway by a bulkhead consisting in part of wooden piles and in part of wood and sheet steel piles and cribbing. The coal yard in question had been built up by plaintiff and its predecessors in title so as to bring the surface of the property level with the top of the bulkhead.
The tract of land embraced within the coal yard in question consisted of about 44,388 square feet known as lots 99-144 located on the northerly side of West 221st Street, Borough of Manhattan, City of New York, extending to the southerly line of the Harlem River and bounded on the west by the easterly line of Broadway and on the east by the property of the Bradley-Mahoney Coal Corporation. The property extends along the bulkhead line of the Harlem River a distance of 468 feet, about 100 feet landward, with a frontage on Ninth Avenue of 415 feet. The watercourse, now known as the Harlem River, separating Manhattan Island from the mainland, consists of Harlem River and Spuyten Duyvill Creek making a continuous waterway about eight miles in length forming a tidal estuary between the Hudson and East Rivers. The two streams originally met at King’s Bridge where the water, at high tide, was six feet deep.
In 1873, pursuant to an Act of Congress, the Government made a survey looking to improvement of Harlem River and, as a result of that survey, reported in February 1874 the desirability of a waterway navigable at all times by way of Harlem River and Spuyten Duyvill Creek. In 1876 the Government, through its engineers, was investigating the possibility of improving the waterway by cutting a channel across Dyckman’s Meadows so as to eliminate *227 the loop formed by approaches to the confluence of the Harlem River and Spuyten Duyvill Creek at King’s Bridge. However, Congress did not make any funds available for the work of excavating the channel through Dyckman’s Meadows until the necessary land and rights incident to construction of the channel had been secured to the United States free of cost. By 1887 the necessary land and rights had been obtained by the United States free of cost, and Congress, in that year, made an appropriation of funds and authorized the construction of the canal through Dyck-man’s Meadows for the purpose of making Harlem River and Spuyten Duyvill Creek navigable at all times throughout the distance between the Hudson and East Rivers. In 1895 the cut through Dyckman’s Meadows was completed and in 1907 a navigable channel 15 feet deep and 150 feet wide was dredged between the Hudson and East Rivers. This channel passed along the frontage of what is now the plaintiff’s property. Prior tb construction of the cut through Dyckman’s Meadows and the dredging of the entire channel between the Hudson and East Rivers, the United States had obtained from the then owners of the property involved in this suit titles to such property and property rights as were necessary to the construction and maintenance of the canal through Dyckman’s Meadows, including any rights adjacent to the actual dimensions of the navigable channel that might be affected by construction of the navigable waterway.
The record in this case does not show when the bulkhead supporting the property in question along the edge of the navigable waterway was constructed. Percy Roden purchased a part of the property in question in 1923 and the balance in 1924. At the time of this purchase he transferred the property to G. M. Roden & Son, a corporation, all the stock of which was owned by plaintiff and his father. In 1926 Percy Roden purchased the interest of his father in G. M. Roden & Son and thereafter, in 1933, the Roden Coal Company, Inc., all the stock of which he owned, acquired title to the property in question and has owned the same since that time.
*228 Percy Roden purchased the property from the Rapid Transit Construction Company in 1923. At that time, and for a number of years prior thereto, the property had the same bulkhead constructed of wooden piles and cribbing to support the yard which had been constructed landward of the Harlem River. The Transit Company had owned and used the property since about 1900 for unloading barges and for storage on the property of material used by that company in its construction work.
For some time prior to 1925 the property in question had been used under lease by the Ames Transfer Company, a dealer in building materials, for unloading and storing, and for delivery of building materials such as sand, gravel, brick, and other building materials. Prior to the date plaintiff acquired title to the property in 1933 it occupied same under a lease from G. M. Roden & Son at a rental of $1,000 a month, plus taxes and interest on a mortgage of $125,000. Soon after the property was acquired by Percy Roden in 1923-1924 certain facilities, such as scales and an office building, were constructed on the property and in 1926 large coal pockets and hoppers were constructed for handling coal of all kinds through bins. Cranes and a hoisting plant, with a steam hoist and boiler, to remove coal from barges to the receiving hopper on top of the coal pockets were also constructed. In addition there was constructed a re-screening plant. The construction of these large facilities greatly increased the load which the bulkhead had to bear. At that time the dock along the channel was also enlarged and extended. The waterfront of the property in question, represented by the line established by the Secretary of War October 18, 1920, was also the boundary of the land to which title in fee had been taken by the United States July 10, 1886, in condemnation proceedings for the use of the United States in constructing the cut-off channel 15 feet deep and 150 feet wide as a part of the navigable waterway between the Hudson and East Rivers, as hereinbefore mentioned. Ever since the completion and dredging of the cut-off channel in 1907 the property now owned by plaintiff, including the bulkhead which appears to have been *229 first constructed about 1900, has fronted on a navigable artificial waterway of a minimum depth of 15 feet which the Government has maintained by dredging operations. Following the earlier dredgings, the defendant in maintaining and improving navigation on the waterway connecting the Hudson and East Rivers dredged the channel in the general vicinity of the property involved in this case from April 16 to 27, 1926, and from November 29, 1929, to January 13, 1930. In these dredging operations the defendant did not in any way encroach upon the property in question. There was some settlement of the ground landward of the bulkhead following the 1929-1930 dredging, but such settlement was not of a serious nature. This settlement was due to pressure on the bulkhead shoreward thereof which tended to push the top of the wooden piling riverward by reason of inadequate support for the piling at its base.
In 1931 plaintiff’s predecessor in title, with the permission of the Secretary of War, placed additional steel piling along the face of the existing piling bulkhead for a distance of 128 feet westward from the east boundary of the property in question. The failure or collapse of the wooden portion of the bulkhead following the 1937 dredging operations of the defendant, hereinafter mentioned, was west of the additional steel piling installed by the owner of the property in 1931.
November 1, 1937, following the letting by the defendant of contracts for the dredging of numerous areas in the channel, the Government commenced dredging operations close to plaintiff’s property, and on November 3 it was found that cracks had developed in the coal yard land shoreward by reason of the wooden portion of the bulkhead being forced riverward. The dredge was immediately removed to a point in midstream where it continued operations. The land shoreward of the bulkhead continued to crack and by November 18 the surface of the coal yard, where the break in the ground had occurred, had settled about a foot; thereupon the defendant stopped all dredging operations in Area 20. The defendant did not in any of its dredging operations in 1937, or prior thereto, exceed the authorized *230 and legal dimensions of the waterway, or exceed the reasonable needs of navigation. The level of the river was not and had not been raised or lowered by the United States or its agents.
From the foregoing it is clear that the defendant did not in any way encroach upon any property rights of plaintiff, and, under the facts disclosed, there is no justification for application of the principle of a constructive taking upon which to base an implied promise to pay just compensation under the Fifth Amendment, measured either by the value of the property or by the difference between the market value of the property before the wooden portion of the bulkhead collapsed and the market value thereof afterwards. The plaintiff acquired the property subject to the undeniable right of the United States to maintain a navigable waterway at the authorized depth and width. The damage to plaintiff’s coal yard property was due to inadequate foundation support for the wooden bulkhead piling by reason of the age of the bulkhead, the natural effect of the water in the navigable channel, and the pressure on the bulkhead on the landside thereof. It is true that the bulkhead in part had been there since about 1900, and before the channel was dredged to the authorized depth and width along the property in question in 1907, but the United States was not a guarantor of the adequacy of the bulkhead. When plaintiff acquired the property it acquired it subject to the existing rights of the United States, and plaintiff did not acquire any right to prevent the United States from properly maintaining the navigable waterway or to compel it to answer for any damage that might result from collapse of the bulkhead by reason of proper maintenance of the waterway by the defendant.
The damage resulting to plaintiff’s property was due to plaintiff’s failure to maintain an adequate bulkhead. Such damage was not the result of the taking by the defendant of any property rights of plaintiff, and whatever effect the defendant’s dredging operations may have had upon plaintiff’s bulkhead, the resulting damage because of its collapse *231 was indirect and consequential to the exercise by the defendant of a lawful power.
Plaintiff relies chiefly upon the opinions in United States v. Lynah, 188 U. S. 445, and United States v. Cress, 243 U. S. 316. But it is clear that the decisions in those cases, as explained and applied in United States v. The Chicago, Milwaukee, St. Paul and Pacific Railroad Company, et al., 312 U. S. 592, do not support the claim of this plaintiff under the facts disclosed.
With reference to plaintiff’s other contention that it should be given judgment for the loss and damage sustained because the Government’s dredging operations were carried on pursuant to an Act of Congress, it is sufficient to say that the Act authorizing the maintenance of this waterway did not assume any obligation to pay damages which might result to property owners, situated as was plaintiff, as a consequence of such maintenance operation. The claim cannot, therefore, be said to be one arising under a law of Congress. In order for this court to entertain a suit and enter judgment upon a claim arising under a law of Congress, the statute upon which the claim is based must grant the right asserted. The acts under which the dredging operations in 1931 and prior years were carried on clearly did not, expressly or impliedly, confer upon plaintiff the right to be compensated for damages, even if such damages had directly resulted from the authorized dredging operations by the Government within the limits of its own property.
The plaintiff’s petition and the petition of the intervenor will be dismissed and it is so ordered.
Madden, Judge; Jones, Judge; and Whaley, Chief Justice, concur.
Whitaker, Judge, took no part in the decision of this case.