**Edward BUNDRICK, Yzobel Bundrick and Ruby Bundrick**

v.

**The UNITED STATES.**

**No. 622–82L.**

United States Claims Court.

March 18, 1985.

As Corrected March 21, 1985.

---

David L. Curl, Tucson, Ariz., for plaintiffs. Louis W. Barassi, Tucson, Ariz., of counsel.

Patricia N. Young, Washington, D.C., with whom was Asst. Atty. Gen. F. Henry Habicht, II, Washington, D.C., for defendant.

## OPINION

WHITE, Senior Judge.

The plaintiffs in this case seek to recover for the alleged taking by the United States, through inverse condemnation, of an interest in 1,913.99 acres of land and related improvements, situated in Pinal County, Arizona.

Plaintiffs Edward Bundrick and Ruby Bundrick are husband and wife. Plaintiff Yzobel Bundrick is the mother of Edward Bundrick.

The land involved in the case (which, for the sake of convenience, will sometimes be referred to hereafter in the opinion as "the Bundrick land") is owned by plaintiffs Yzobel Bundrick and Edward Bundrick, the former owning an undivided three-fourths interest and the latter owning an undivided one-fourth interest in the land. (As plain-

tiff Ruby Bundrick appears to be a party to the case only because she is married to plaintiff Edward Bundrick, the term "plaintiffs," as used subsequently in the opinion, will refer only to plaintiffs Yzobel Bundrick and Edward Bundrick, unless the context plainly indicates otherwise.)

The litigation was first instituted in the United States District Court for the District of Arizona. The complaint, as filed with the District Court, coupled the inverse condemnation claim with certain other claims against the United States. On November 29, 1982, the District Court entered an order and judgment which dismissed with prejudice "all claims encompassed by the complaint other than the inverse condemnation claim," and transferred the case to this court (as successor to the former United States Court of Claims) for proceedings relative to the inverse condemnation claim.

After the conclusion of pretrial proceedings, a trial was held by this court during the latter part of November 1984 in Phoenix, Arizona. The parties requested and were granted an opportunity to file post-trial briefs and requested findings; and this procedure was completed on February 27, 1985.

### The Bundrick Land

The Bundrick land is divided into two separate parcels, which are sometimes referred to in the record as "the west parcel" and "the east parcel." The west parcel includes a total of 1,440 acres and consists of the NE ¼ of Section 27 and all of Sections 26 and 35, Township 4 South, Range 17 East, Gila and Salt River Base and Meridian, Pinal County, Arizona. The east parcel includes a total of 473.99 acres and consists of the S ½ SE ¼ and the SW ¼ of Section 5, and the N ½ SE ¼, the SW ¼ NE ¼, the S ½ NW ¼, and the NW ¼ NW ¼ of Section 6, Township 5 South, Range 18 East, Gila and Salt River Base and Meridian, Pinal County, Arizona.

A distance of 1 mile separates the two parcels at the nearest points. The east parcel lies to the southeast of the west parcel.

Both the west parcel and the east parcel are traversed by Deer Creek, a valuable source of water.

The plaintiffs' titles to the tracts of land comprising the two parcels are traceable to several homestead patents that were issued by the United States between 1896 and 1934. The validity of the titles is not questioned by the defendant in this litigation.

The Bundrick land is located approximately 15 miles, by road, northeast of Winkelman, Arizona.

The Bundrick land was acquired in 1953 by plaintiff Yzobel Bundrick and her husband, for use as part of a cattle raising operation. At about the same time—as the Bundrick land itself did not contain sufficient acreage for a viable cattle operation in that part of Arizona—plaintiff Yzobel Bundrick and her husband acquired from the State of Arizona leases on approximately 6½ sections of land; and they acquired from the United States (represented by the Department of the Interior) leases on approximately 12,800 acres of federal land that the Interior Department was administering under the Taylor Grazing Act (43 U.S.C. § 315 et seq. (1982)). At that time, and in the ranching region of Arizona, if a person owned patented land and there was adjacent to it state or federal land not under lease to someone else, the landowner was given an opportunity to lease the state or federal land. The leased lands were contiguous to the Bundrick land at some point. The combination of the Bundrick land and the leased lands provided plaintiff Yzobel Bundrick and her husband with sufficient acreage for the establishment and operation of a cattle ranch. The ranch was operated for approximately 20 years.

Plaintiff Yzobel Bundrick and her husband made permanent improvements on both the land leased from the State of Arizona and the land leased from the Department of the Interior. A residence, a shack, fences, and corrals were constructed, and two wells were dug, on the state land; and the Bundricks made their home

in the residence. Fences, another corral, and a scale for weighing cattle were built on the federal land.

In later years, the ranching operation was conducted by plaintiff Yzobel Bundrick and her son, plaintiff Edward Bundrick, although the latter never lived on the ranch.

### The San Carlos Mineral Strip

The Bundrick land and the leased lands which formed part of the Bundrick ranch were all located within the exterior boundaries of the area known as the San Carlos Mineral Strip (which, for the sake of convenience, will sometimes be referred to hereafter in the opinion as "the Mineral Strip").

The Mineral Strip is an area of approximately 232,000 acres. When the San Carlos Indian Reservation was set aside by Executive Orders in 1871 and 1872 for the San Carlos Apache Indian Tribe, the Mineral Strip was part of the reservation. After the creation of the San Carlos Indian Reservation, however, non-Indians who believed that the Mineral Strip contained valuable mineral deposits sought to take the Mineral Strip from the Indians. The Appropriations Act of March 2, 1895, authorized negotiations with the San Carlos Apache Indian Tribe for the cession of the Mineral Strip; and a cession agreement was reached on February 25, 1896. Subsequently, pursuant to the Act of June 10, 1896, the Mineral Strip was ceded formally to the United States by the tribe and became federal land. The cession was made, however, under the condition that such land would be "open to occupation, location, and purchase under the provisions of the mineral land laws only." (The land of the Mineral Strip will sometimes be referred to hereafter in the opinion as "ceded" land.)

From 1896 to 1934, the United States issued homestead patents covering some ceded lands in violation of the restriction that entry was to be permitted only under the provisions of the mineral land laws; and the United States also erroneously granted some ceded lands to the State of Arizona as school and indemnity lands. In order to prevent further error, the First Assistant Secretary of the Interior on March 30, 1931, withdrew the remaining Mineral Strip lands from all forms of entry or disposition.

On June 18, 1934, Congress passed the Indian Reorganization Act (48 Stat. 984; codified as 25 U.S.C. § 461 et seq. (1982)). The Secretary of the Interior was expressly authorized by 25 U.S.C. § 463 to restore to tribal ownership the remaining surplus lands of any Indian reservation opened before June 18, 1934. Not long thereafter, on September 19, 1934, the Secretary of the Interior directed that all undisposed lands of certain Indian reservations, including the San Carlos Indian Reservation, be withdrawn from disposal temporarily, until a determination could be made regarding permanent restoration to tribal ownership of such lands, as authorized by the Indian Reorganization Act. (The Mineral Strip lands had already been withdrawn from disposition.)

In June 1941, the First Assistant Secretary of the Interior approved an agreement made by certain other officials of the Department of the Interior (i.e., the Assistant Commissioner of Indian Affairs, the Commissioner of the General Land Office, and the Director of Grazing) to place the Mineral Strip lands under temporary range management, in accordance with the provisions of the Taylor Grazing Act, until final disposition of such lands could be made. Following this agreement, grazing permits and leases were issued by the Department of the Interior to various individuals for the conduct of ranching operations on the ceded lands, other than those patented to individuals or granted to the State of Arizona. Such leases were obtained by plaintiff Yzobel Bundrick and her husband in 1953, covering approximately 12,800 acres of ceded land adjacent to the Bundrick land.

On June 17, 1963, the Under Secretary of the Interior issued Order No. 2874 (28 Fed. Reg. 6408), which restored all "mineral, oil and gas resources" in the Mineral Strip to the San Carlos Apache Indian Tribe, "sub-

ject to any valid existing rights." This order, however, expressly excluded from its provisions any patented lands, and subsurface interest in patented lands, situated within the Mineral Strip.

On September 12, 1968, the San Carlos Apache Tribal Council adopted a resolution requesting the Secretary of the Interior to restore to tribal ownership the surface interest in lands within the Mineral Strip. Some months later, on January 16, 1969, the Secretary of the Interior signed an order which restored the surface of the lands within the Mineral Strip to the tribe, subject to valid existing rights. The order was published on January 24, 1969 (34 Fed. Reg. 1195). The lands affected by this order, including the 12,800 acres of land previously leased to the Bundricks pursuant to the Taylor Grazing Act, thus became part of the San Carlos Indian Reservation. Thereafter, the Bundrick land and the adjacent state land leased by the Bundricks were completely surrounded by Indian land.

The order of January 16, 1969, expressly excluded any patented lands from its operation. As of that time, 6,340 acres of land in the Mineral Strip were patented under homestead laws and 1,740 acres were patented under the mineral land laws. In addition, approximately 200,000 acres of land were subject to grazing leases or permits that had been issued under the provisions of the Taylor Grazing Act.

After the termination, by a court decree dated April 11, 1978, of a lawsuit between the State of Arizona and the United States, the United States reacquired, in trust for the San Carlos Apache Indian Tribe, title to all lands within the Mineral Strip which had previously been held by the State of Arizona, including the 6½ sections of land previously leased by the State to the Bundricks. The lands reacquired by the Federal Government thereupon became part of the San Carlos Indian Reservation.

Since April 11, 1978, the west parcel and the east parcel of the Bundrick land have each been completely surrounded by tribal land comprising part of the San Carlos Indian Reservation.

As lands within the Mineral Strip were restored to tribal ownership and made part of the San Carlos Indian Reservation under the administrative order of January 16, 1969, and pursuant to the court decree of April 11, 1978, the federal supervisory function with respect to such lands was vested in the Bureau of Indian Affairs of the Department of the Interior.

### The Road

At all times material to this case, there has been, and there is now, a road running between the headquarters of the Bundrick ranch, including the Bundrick residence, and an intersection with Arizona Highway 77 about 1 mile south of Winkelman, Arizona. From the highway intersection, the road proceeds about 4 miles to the western boundary of the Mineral Strip, and then runs approximately 10 miles through the Mineral Strip in a general easterly direction to the Bundrick ranch headquarters.

As of 1953, when the Bundrick ranch was established, and for a number of years thereafter, the portion of the road extending eastward from the Mineral Strip boundary first traversed federal land administered by the Department of the Interior under the Taylor Grazing Act, and then crossed land granted to the State of Arizona, before reaching the Bundrick ranch headquarters. Neither the Department of the Interior nor the State of Arizona ever made any objection to the presence of the road, or interfered in any way with the use of the road by the Bundricks.

After the effective date of the order of January 16, 1969, any travel to or from the remaining lands of the Bundrick ranch involved crossing Indian land. Then, after the former state land within the Mineral Strip was made part of the San Carlos Indian Reservation as a result of the court decree of April 11, 1978, the road traversed only Indian land between the western boundary of the Mineral Strip and the Bundrick land.

The road between the Bundrick ranch headquarters and the highway is a dirt country road. It was privately built by the man from whom the Bundricks acquired their lease on state-held grazing land. Pinal County maintained the road until the state land was acquired by the United States, in trust for the San Carlos Apache Indian Tribe, and was made part of the Indian reservation. Beginning in about 1972, plaintiff Edward Bundrick also did some maintenance work on the road, in cooperation with Pinal County.

Plainntiff Yzobel Bundrick was still living on the Bundrick ranch when Pinal County discontinued its maintenance work on the road. Thereafter, until plaintiff Yzobel Bundrick moved from the ranch to Coolidge, Arizona, the road was maintained by plaintiff Edward Bundrick, so that his mother could travel to Winkelman for groceries and other subsistence needs.

After the lands, other than patented lands, within the Mineral Strip were made part of the Indian reservation, the Tribal Council of the San Carlos Apache Indian Tribe requested that persons, including the plaintiffs, who regularly crossed tribal land in passing to and from patented land obtain permits authorizing travel within the reservation. The plaintiffs, however, never applied for or obtained permits, and they continued to travel over the road to and from the Bundrick ranch whenever they wished to do so. Plaintiff Edward Bundrick was stopped by Indian police within the reservation on several occasions. He was asked for identification or why he was on tribal land. He supplied the information requested, and was permitted to continue his journey on each occasion. The evidence in the record indicates that plaintiff Yzobel Bundrick was never stopped or otherwise interfered with by Indian police or other Indian personnel when using the road.

*End of Ranching Operation*

After the federal land within the Mineral Strip was restored to tribal ownership and made part of the San Carlos Indian Reservation, the Tribal Council of the San Carlos Apache Indian Tribe in 1970 authorized the issuance of grazing permits on such land. Permits were issued on a yearly basis to non-Indian ranchers in the Mineral Strip, including the plaintiffs, in 1970, 1971, and 1972. The plaintiffs' permits covered the same land previously leased from the Department of the Interior.

The permits issued to the plaintiffs and others in 1972 were due to expire at the end of June 1973. Some months before June 1973, the Tribal Council decided that they would not issue any more permits to non-Indians; and they instructed the personnel administering the grazing resource to notify the permittees of the council's decision. In accordance with this decision of the council, the San Carlos Indian Agency of the Bureau of Indian Affairs issued a communication to the plaintiffs on February 15, 1973, stating in part as follows:

> Your Grazing Permit * * * [will] expire June 30, 1973. Beginning July 1, 1973 a Grazing Permit will not be issued to non-Indians.

> As indicated by the attached resolution number 73–8 the San Carlos Apache Tribe will use this area to graze their own livestock.

> This notice is being given to you well in advance of the expiration of your grazing permit to provide adequate time for you to make arrangements for the removal of your livestock from the Reservation prior to July 1, 1973. Any livestock not removed by this date will be in trespass and subject to penalties prescribed in the Code of Federal Regulations, Title 25, 151.24.

After the plaintiffs were informed that they could no longer obtain a permit to use any of the tribal land for grazing purposes, they sold their cattle to another person and terminated the ranching operation, which the Bundrick family had conducted since 1953. Without the use of the adjacent 12,-800 acres of onetime federal land formerly leased under the Taylor Grazing Act, the plaintiffs did not have sufficient acreage for a viable cattle raising operation.

Plaintiff Yzobel Bundrick, however, continued to reside in the house on the ranch until June 1978. She then moved to Coolidge, Arizona. The move was made for economic reasons, and not because of any difficulty with the Indians of the San Carlos Indian Reservation. Since June 1978, the plaintiffs have not derived any substantial benefit from the Bundrick land.

It appears that cattle have been observed grazing on the Bundrick land from time to time since the plaintiffs discontinued their ranching operation, but such cattle belonged to some person or persons other than the plaintiffs and the cattle were on the land without the permission of the plaintiffs.

The initial trial of the case was held on the issue of liability only, and did not deal specifically with the issue of damages. The record developed at the trial, however, indicates that the Bundrick land, as part of the ranching operation that also included about 6½ sections of land leased from the State of Arizona and approximately 12,800 acres of federal land leased under the Taylor Grazing Act, had a substantial fair market value; and that the value of the Bundrick land was greatly diminished as a result of the transfer to tribal ownership of the formerly leased lands and the consequent loss of their use as part of the ranching operation.

*Remedial Legislation*

In December 1974, Congress enacted Public Law 93–530 (88 Stat. 1711). This statute "authorized and directed [the Secretary of the Interior] to acquire through purchase within the so-called San Carlos Mineral Strip as of January 24, 1969, all privately owned real property, taking title thereto in the name of the United States in trust for the San Carlos Apache Indian Tribe," and to purchase from the owners "all range improvements of a permanent nature, placed, under the authority of a permit from or agreement with the United States, on the lands restored to the San Carlos Apache Indian Tribe for the reason-

able value of such improvements, as determined by the Secretary * * *."

In accordance with the authorization contained in the legislation, the Secretary of the Interior engaged the services of independent professional appraisers to appraise the value of the patented lands within the Mineral Strip and the value of the improvements made by the owners of patented lands on other lands formerly used by them under lease. The appraisers were instructed by the Secretary of the Interior (or his representatives) to determine the valuations as of January 24, 1969 (the date when the order restoring ceded lands to tribal ownership was published).

After the respective appraisals were completed in 1977 and 1978, representatives of the Secretary of the Interior entered into negotiations with the owners of the patented lands within the Mineral Strip for the purchase of such lands and to reimburse the owners for improvements placed on lands previously used under lease.

The original appraisal report made on the plaintiffs' land and the related improvements in the Mineral Strip by an independent appraiser placed a value of $144,000 on the Bundrick land and a value of $106,432 on the improvements located on the previously leased land, thus making the total appraised value $250,432.

The plaintiffs were dissatisfied with the first appraisal. They contended that the total value of the Bundrick land and the improvements on formerly leased lands was $621,500, rather than $250,432.

On January 19, 1979, an independent appraiser submitted a new valuation for the Bundrick land and related improvements. The value of the improvements on previously leased land was increased by $5,606, but the value of the Bundrick land was not increased from the previous figure of $144,000. Therefore, the new appraisal report fixed a value of $256,038 for the land and the improvements. This figure was not satisfactory to the plaintiffs.

The negotiations between the plaintiffs and representatives of the Secretary of the

Interior were ultimately unsuccessful, as the parties were never able to agree on the value of the Bundrick land. Agreement was reached on the value of the improvements on lands previously leased, but government personnel refused to reimburse the plaintiffs for the improvements in the absence of an agreement for the purchase of the Bundrick land.

The appraisals on all patented lands and related improvements within the Mineral Strip were made in the same manner. By 1979, and based on the appraisals, representatives of the Secretary of the Interior were able to conclude successfully negotiations with all owners of patented lands within the Mineral Strip—except the plaintiffs in this case and in the related case of *Alder v. United States*, 7 Cl.Ct. 542—for the purchase of all patented lands, and for reimbursement to the landowners for the improvements previously placed on leased lands.

The plaintiffs in this case and in the *Alder* case, and all former owners of patented lands within the Mineral Strip, have lived elsewhere in recent years. The plaintiffs in this case and in the *Alder* case, unlike the other landowners, still retain the titles to their patented lands within the Mineral Strip.

The claim prosecuted by the plaintiffs in this court is not based on Public Law 93–530, but on the basis of an alleged taking by the United States of property, through inverse condemnation, without just compensation. To the extent that the plaintiffs' complaint, as filed in the District Court, sought redress under Public Law 93–530, the complaint was dismissed by the District Court; and that aspect of the case is *res adjudicata* here.

### Discussion—Improvements

In this court, the plaintiffs' claim is restricted to the contention that they are entitled to just compensation under the Fifth Amendment to the Constitution because of the alleged taking by the United States, through inverse condemnation, of (1) the improvements that were placed on the ceded lands which the plaintiffs formerly leased from the Department of the Interior under the Taylor Grazing Act and from the State of Arizona, and (2) the Bundrick land.

With respect to the improvements aspect of the plaintiffs' claim, the plaintiffs do not contend that the United States breached the respective leases by terminating them improperly, or that the United States took their leasehold interest in the leased lands by unlawfully ousting them from the lands while the leases were still in effect. Thus, the case does not involve the loss of the use of the leased lands themselves, but only the loss of the use of the permanent improvements on the lands previously leased by the plaintiffs.

Just why the plaintiffs believe that they had a property interest, compensable under the Fifth Amendment, in the permanent improvements on the leased lands, when the plaintiffs apparently concede that they did not have a compensable leasehold interest in the lands themselves, is not explained in the plaintiffs' brief.

On the contrary, the plaintiffs correctly state in their brief that "[f]ixtures attached to real property are generally considered a part of the realty." Accordingly, as the permanent improvements on the leased lands were part of the realty, and as the plaintiffs concede, by implication at least, that the transfer of the lands to the Indian tribe did not violate any constitutionally compensable property right or interest of the plaintiffs in the lands, it necessarily follows that the transfer did not violate any constitutionally compensable property right or interest of the plaintiffs in the permanent improvements on the lands formerly held under lease.

It must be concluded, therefore, that no property right or interest of the plaintiffs, compensable under the Fifth Amendment, in the permanent improvements on leased lands was unlawfully taken by the United States when such lands, through action by the Federal Government, became Indian land.

Of course, the question of whether the plaintiffs have a cause of action against the State of Arizona under Arizona statutory law for the value of the improvements on the land which the plaintiffs once held under lease from the State of Arizona and which the State disposed of to the United States, in trust for the San Carlos Apache Indian Tribe, is not before this court. *Cf. State Land Department v. Painted Desert Park, Inc.*, 102 Ariz. 272, 428 P.2d 424 (Ariz.1967). It is clear that the plaintiffs cannot base a cause of action against the United States on the provisions of an Arizona statute. Insofar as claims against the United States based on legislation are concerned, Congress has authorized courts to adjudicate only those claims that are based upon "any Act of Congress" (28 U.S.C. §§ 1346(a)(2), 1491(a)(1) (1982)). Therefore, a person seeking to assert a claim against the United States under a statutory provision must show that the claim is one cognizable under an "Act of Congress." *Cf. Roden Coal Co. v. United States*, 95 Ct.Cl. 219, 231 (1941), *cert. denied*, 317 U.S. 636, 63 S.Ct. 28, 87 L.Ed. 513 (1942).

■ Moreover, the gravamen of the plaintiffs' claim for the value of improvements on leased lands is stated in the plaintiffs' brief as follows: "[w]hen Plaintiffs lost the right of use to the [leased] land, they lost the right to the use of their improvements." In this connection, the evidence in the record shows that the plaintiffs lost the right to use the former federal land not later than July 1, 1973, the day after the date of the expiration of the plaintiffs' final permit from the San Carlos Apache Indian Tribe covering the use of this land. The Tribal Council refused to issue a new permit to the plaintiffs, after having previously notified the plaintiffs that they must remove their cattle from the land before the expiration of the final permit.

On and after July 1, 1973, therefore, the plaintiffs did not have any right to use the land which they formerly held under federal lease; and, as the plaintiffs state in their brief, having lost the use of the land, they thereby lost the right to the use of the improvements on the former federal land. Thus, the plaintiffs' claim for the loss of the use of these improvements accrued no later than July 1, 1973. By that date, at the latest, all the events necessary to fix the liability (if any) of the United States had occurred; and the plaintiffs were entitled to institute an action against the United States for the loss of the use of the improvements on the federal land formerly leased under the Taylor Grazing Act; and the pertinent period of limitations began to run. *Cf. Japanese War Notes Claimants Association of the Phillipines, Inc. v. United States*, 178 Ct.Cl. 630, 632–33, 373 F.2d 356, 358, *cert. denied*, 389 U.S. 971, 88 S.Ct. 466, 19 L.Ed.2d 461 (1967), *rehearing denied*, 390 U.S. 975, 88 S.Ct. 1020, 19 L.Ed.2d 1192 (1968).

■ It was necessary that an action on the plaintiffs' claim be instituted under 28 U.S.C. § 1491 (1970); and 28 U.S.C. § 2501 provided that every such claim "shall be barred unless the petition thereon is filed within six years after such claim first accrues." The filing of an appropriate petition or complaint within the prescribed 6-year period was—and still is—a jurisdictional requirement. *Soriano v. United States*, 352 U.S. 270, 273, 77 S.Ct. 269, 271, 1 L.Ed.2d 306 (1957); *Kirby v. United States*, 201 Ct.Cl. 527, 539 (1973), *cert. denied*, 417 U.S. 919, 94 S.Ct. 2626, 41 L.Ed.2d 224 (1974); *Fattore v. United States*, 160 Ct.Cl. 666, 670, 312 F.2d 797, 800 (1963); *Parker v. United States*, 2 Cl.Ct. 399, 402 (1983); *Lewis v. United States*, 1 Cl.Ct. 158, 160–61 (1983).

This being so, the plaintiffs' original complaint for the alleged taking, which was filed in the United States District Court for the District of Arizona on October 16, 1981, was filed more than 2 years too late with respect to the loss of the use of improvements on land formerly held under federal lease.

Accordingly, the plaintiffs' failure to assert their claim under the Fifth Amendment for the alleged taking of the improvements on the former federal land within

the prescribed 6-year period would, in any event, preclude this court from considering the merits of the claim.

### Discussion—Bundrick Land

The gist of the plaintiffs' claim with respect to the alleged taking of the Bundrick land by the United States is summarized as follows:

When the Bundrick ranch was established in 1953, and for a number of years thereafter, the Bundricks had an enforceable legal right of access to the Bundrick land even though it was necessary to cross federal land and state land in order to reach the Bundrick land. Arizona statutory law gave them an enforceable right to acquire access insofar as the state land was concerned; and, in addition, an easement across the state land was acquired through prescription, inasmuch as the portion of the privately built road which crossed state land was used by the Bundricks for more than 10 years. Also, the Bundricks had an easement of necessity across the federal land, because the Bundrick land could not be reached without crossing federal land.

As a result of the action of the United States in acquiring the state land and making both the federal land and the land acquired from the state part of the Indian reservation, the United States deprived the plaintiffs of their enforceable legal right of access to the Bundrick land. Thereafter, access to the Bundrick land could be had only by obtaining a revocable permit from the Indian tribe to traverse Indian land; and such a permit is not enforceable. The United States, by completely surrounding the Bundrick land with Indian land, has taken the plaintiffs' right of ingress and egress, and has rendered the Bundrick land unmarketable and without value for use as collateral for a bank loan.

■ Assuming for the purpose of discussion—but without deciding—that all of the plaintiffs' contentions previously summarized are correct, the conclusion is inescapable that the taking of the Bundrick land

occurred on the effective date of the administrative order of January 16, 1969, which restored all federal land within the Mineral Strip to the San Carlos Apache Indian Tribe and made such land part of the San Carlos Indian Reservation. After that date, it was necessary for anyone traveling to or from the Bundrick land to cross Indian land. The Bundrick land and the land still held under lease from the State of Arizona were completely surrounded by Indian land. The privately built road running from the western boundary of the Mineral Strip to the Bundrick ranch first traversed Indian land before it reached the state land leased by the Bundricks, and on which the Bundrick ranch headquarters had been established.

Under the plaintiffs' theory of liability for the taking of the Bundrick land, therefore, the plaintiffs no longer had an enforceable legal right of ingress and egress to and from the Bundrick land after the effective date of the restoration order, and that order subjected the Bundrick land to all of the adverse consequences allegedly flowing from being "landlocked" (the plaintiffs' term) by Indian land.

■ As any claim which the plaintiffs may have had on the basis of the alleged taking by the United States, through adverse condemnation, of the Bundrick land first accrued on the effective date of the restoration order of January 16, 1969, the plaintiffs were required by 28 U.S.C. § 2501 to institute an action on the claim within the ensuing 6-year period. This was not done, as the plaintiffs' original complaint in the United States District Court for the District of Arizona was not filed until October 16, 1981, or more than 12 years after the claim first accrued.

■ Therefore, as indicated in court decisions cited earlier in the opinion, the court is without jurisdiction to consider the merits of the plaintiffs' claim with respect to the alleged taking of the Bundrick land.

### CONCLUSION OF LAW

For the reasons previously stated in the opinion, the court concludes as a matter of

law that the plaintiffs are not entitled to recover.

The clerk will dismiss the complaint. IT IS SO ORDERED.