**Gilbert M. HAIR, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 01–521C.**

United States Court of Federal Claims.

April 15, 2002.

Anthony D'Amato, Chicago, IL, for plaintiff. Susan M. Keegan and David G. Duggan, of counsel.

Amy Allen Ruggeri, Washington, DC, with whom was Robert D. McCallum, Jr., Assistant Attorney General. James G. Hergen and Lara A. Ballard, U.S. Department of State, of counsel.

**OPINION**

FIRESTONE, Judge.

This matter comes before the court on the United States' November 13, 2001 motion to dismiss pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC"). On September 12, 2001, plaintiffs Gilbert M. Hair and Ethel Blaine Millett filed their complaint on behalf of a large putative class of United States citizens who were either killed or injured by the Japanese armed forces during World War II.[1] The plaintiffs allege that the United States is liable to them for a taking without

---

1. The plaintiffs purport to represent a class of between 437,025 and 600,000 members, "all United States citizens injured or killed as a result of Japan's criminal war of aggression commencing with a Japanese surprise attack on Pearl Harbor on December 7, 1941, and culminating with the cease-fire on September 2, 1945." By order dated October 17, 2001, this court stayed class certification proceedings pending resolution of the government's motion to dismiss.

just compensation under the Fifth Amendment, in connection with the April 28, 1952 ratification of the 1951 Treaty of Peace with Japan, known as the "San Francisco Treaty of Peace." Plaintiffs contend that as a result of the San Francisco Treaty, the United States committed a "taking" of their claims for damages against Japan. The government counters that any taking claim the plaintiffs allege is barred by the six-year statute of limitations governing claims against the United States under 28 U.S.C. § 2501 (1991 & Supp.2001). For the reasons set forth below, the court grants the government's motion to dismiss.

## BACKGROUND

The following facts, upon which plaintiffs' claims are predicated, are assumed to be true for purposes of this motion. With the December 7, 1941 attack on Pearl Harbor, Japan brought the United States into World War II. During this war, Japan committed numerous war crimes against United States citizens. It is these crimes that form the basis of the plaintiffs' complaint. In particular, the following are the stories of the two named plaintiffs, Gilbert M. Hair and Ethel Blaine Millett.

It is alleged that on February 2, 1942, Mr. Hair (only nine months old at the time) and his mother were interned at Santo Tomas Prison Camp in the Philippines. They were held as internees until the liberation of Santo Tomas on March 18, 1945. In addition to suffering severe physical deprivation and injury at the hands of his Japanese jailors, Mr. Hair contends that all of his family's property was permanently confiscated by the Japanese. After liberation, Mr. Hair and his mother immediately came to the United States.

For her part, plaintiff Ethel Blaine Millett joined the United States Army on November 22, 1940, and was sent to the Philippines in June 1941. On May 11, 1942, (then) Ms. Blaine was captured by the Japanese after an amphibious transport in which she was riding capsized. On September 9, 1942, she also ended up in the Santo Tomas Prison Camp. She suffered from malnutrition and illness, eventually requiring surgery in the camp's hospital. She remained imprisoned there until the camp's liberation in 1945, and remained in the Army until May 1947.

Plaintiffs state in their complaint that the "United States acknowledged in the San Francisco Treaty of Peace that war reparations, including claims of American nationals, were due from Japan." In particular, they note that Article 14(a) of the Treaty provides:

It is recognized that Japan should pay reparations to the Allied Powers for the damage and suffering caused by it during the war. Nevertheless, it is also recognized that the resources of Japan are not presently sufficient, if it is to maintain a viable economy, to make complete reparation for all such damage and suffering and at the same time meet its other obligations.

Treaty of Peace with Japan, Art. 14(a), 3 U.S.T. 3169 (1951). Plaintiffs also state that the "United States purported to waive all the claims of the present class members in Article 14(b) of the San Francisco Peace Treaty of 1951 ...." Article 14(b) of the Treaty provides:

Except as otherwise provided in the present Treaty, the Allied Powers waive all reparations claims of the Allied Powers, other claims of the Allied Powers and their nationals arising out of any actions taken by Japan and its nationals in the course of the prosecution of the war, and claims of the Allied Powers for direct military costs of occupation.

Plaintiffs acknowledge that "from time to time since 1951," many American citizens who were either themselves injured by Japan or who have next-of-kin who were injured by Japan have contacted the Department of State to request assistance in their quest for damages, and that these citizens have been "consistently informed by official correspondence that all their claims were waived in the San Francisco Peace Treaty." Plaintiffs also acknowledge that under the War Claims Act, 50 App. U.S.C.A. §§ 2001–2017p (1991 & Supp.2001), Congress established a commission to compensate U.S. citizens who were prisoners of war or internees during World

War II. Although payments were limited by the amount of Japanese assets seized by the United States, adult members of plaintiffs' putative class who received payments from the War Claims Fund were paid one or two dollars per day for each day they were held as prisoners of war or internees. Members of the class such as Mr. Hair, who were children at the time of their internment, were paid fifty cents per day of internment. Plaintiffs contend that these payments "did not ... constitute just compensation."

The complaint further states that the two plaintiffs, as representatives of the putative class, have also filed suit in the District Court for the Eastern District of Illinois against the Japanese government, seeking $1 trillion in compensation for their injuries. *See Rosen v. People of Japan*, No. 01C–6864 (E.D. Ill. filed Sept. 4, 2001) (claiming damages arising from numerous injuries such as battery, unlawful imprisonment, intentional infliction of emotional distress, torture, medical experimentation, mutilation, and murder). In their prayer for relief from this court, plaintiffs also seek $1 trillion from the United States for their injuries. The plaintiffs state in their complaint that, "any monies actually collected as a result of *Rosen*, will be set off against the present claim against the United States."

On November 13, 2001, the United States moved to dismiss the case pending in this court, on the grounds that the action is barred by the six-year statute of limitations governing claims for money damages against the United States arising under the U.S. Constitution. After briefing, oral argument was held on April 10, 2002.

## DISCUSSION

The sole issue before the court is whether the present action is barred by the six-year statute of limitations established by 28 U.S.C. § 2501. Plaintiffs acknowledge that

this court's jurisdiction rests upon the Tucker Act, 28 U.S.C. § 1491.[2] Further, plaintiffs concede that "there was a taking of private property for public use on April 28, 1952," upon ratification of the San Francisco Peace Treaty. According to plaintiffs, "the only question dividing the parties to this litigation is whether the plaintiffs' cause of action accrued on April 28, 1952 [at the time of the 'taking'] or whether it accrued at some later date when the government revealed a decision not to pay compensation."

### A. Standard of Review

The standard for deciding a motion to dismiss is well settled. In deciding a motion to dismiss, "whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action," the court must construe the allegations of the complaint in favor of the pleader. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Morris v. United States*, 33 Fed.Cl. 733, 741 (1995). Ultimately, however, the burden is on plaintiffs to establish jurisdiction by a preponderance of the evidence. *See Rocovich v. United States*, 933 F.2d 991, 993 (Fed.Cir.1991); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed.Cir.1988).

### B. The Present Action is Barred by the Statute of Limitations

As noted above, the issue before the court is straightforward. Plaintiffs acknowledge that a taking of their legal rights against Japan occurred when the United States ratified the San Francisco Peace Treaty in April 1952. They assert, however, that the taking claim did not begin to accrue until they learned that the United States would not pay just compensation. Plaintiffs argue that they only learned of the United States' intention not to pay just compensation on November 13, 2001, when the United States filed its

---

**2.** Plaintiffs initially argued that there is no statute of limitations applicable to actions against the United States arising under the Taking Clause, however in their final brief, plaintiffs state as follows: "We do not abandon our constitutional argument, previously expressed, that any statute of limitations applied to the Takings Clause is an unconstitutional attempt to limit its

scope without going through the amendment process. *However we subordinate this argument to the concession, for the purpose of this case, that the six-year statute of limitations does apply so long as the government makes clear its decision not to pay just compensation.*" Pls' Sur-reply at 9 n. 7 (emphasis added).

motion to dismiss this lawsuit. Plaintiffs assert that until November 13, 2001, they held a "reasonable belief" that the government would make good on its "implied promise to pay" just compensation for the claims that were waived by ratification of the San Francisco Peace Treaty on April 28, 1952. According to plaintiffs, a taking claim does not begin to accrue until after the "taking" has occurred *and* the government formally communicates its intention to not keep its Constitutionally-mandated "promise" to pay.

The government argues that plaintiffs' contention that a Fifth Amendment taking claim does not accrue—for statute of limitations purposes—until the government says it will not pay just compensation is contrary to established Federal Circuit precedent and must be rejected. In particular, the government argues that the Federal Circuit and its predecessor the Court of Claims have expressly held that where a taking is alleged to have occurred upon ratification of a treaty, the six-year statute of limitations begins to run from the date the treaty went into effect. *See, e.g., Seldovia Native Ass'n, Inc. v. United States,* 144 F.3d 769, 777 (Fed.Cir.1998); *Alliance of Descendants of Texas v. United States,* 37 F.3d 1478, 1481–82 (Fed.Cir.1994); *Japanese War Notes Claimants Ass'n of the Philippines, Inc. v. United States,* 178 Ct.Cl. 630, 373 F.2d 356, 358 (1967).

The government states that in *Steel Improvement & Forge Co. v. United States,* 174 Ct.Cl. 24, 355 F.2d 627 (1966), the Court of Claims expressly rejected the argument advanced by plaintiffs here: that the six-year statute of limitations clock does not begin to run until the government announces its intention not to pay. In *Steel Improvement,* the plaintiff subcontractor delivered goods to the federal government for which it was never paid. After pursuing various administrative remedies, plaintiffs filed suit in the Court of Claims more than six years after it had delivered the disputed goods. Plaintiff argued that its contract cause of action did not accrue "until the claim had been denied by the Government," nor had the statute of limitations on its taking claim accrued until that time. *See id.* at 631. The court responded: "It is axiomatic that a cause of

action for an unconstitutional taking accrues at the time the taking occurs. Assuming that the Government unconstitutionally took possession of plaintiff's property, such taking was accomplished when the goods were shipped to defendant in October 1954—more than six years prior to the filing of the petition in this case on December 29, 1962." *Id.* (internal citations omitted). As such, the court held that the plaintiff's claims were time-barred.

The government concludes its argument by observing that Congress has made the policy judgment that once a person knows that his/her property has been taken by the federal government, six years is long enough for that person to file suit to determine whether he/she will be compensated.

The government acknowledges that there are situations in which the six-year statute of limitations may be tolled, but contends that plaintiffs in this suit have not alleged any facts to justify tolling of the limitations period. According to the government, in order to justify equitable tolling, a plaintiff must allege that the "defendant has concealed its acts with the result that plaintiff was unaware of their existence or it must show that its injury was 'inherently unknowable at the accrual date.'" *Japanese War Notes,* 373 F.2d at 359. Here, the government argues that the plaintiffs have failed to allege or identify *any* facts to justify tolling of the statute of limitations. The government notes that plaintiffs acknowledge in their complaint that the United States, "has publicly and consistently taken the position ever since 1951 ... that the San Francisco Peace Treaty effectively and in fact waived all the claims of the present class members." In such circumstances, the government contends that the pending action must be dismissed.

The court agrees with the government. 28 U.S.C. § 2501 is completely unambiguous regarding the statute of limitations governing matters in this court: "*Every* claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." (Emphasis added.) This statute of limitations must be strictly construed, as it pertains to the government's

waiver of sovereign immunity. *See Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed.Cir.1988) (holding that since the six-year limitations period is also an express condition of the government's consent to be sued, courts are without jurisdiction to expand that period explicitly provided by Congress). With the six-year period firmly fixed, the court now turns to the question of when plaintiffs' taking claim first accrued.

It is beyond question that under the law of this Circuit, a taking claim based on a treaty accrues "when the taking occurs." *See Alliance of Descendants of Texas*, 37 F.3d at 1481–82. In the circumstances presented here, there is no support for plaintiffs' contention that a taking claim does not accrue until the government announces its refusal to pay just compensation, or that the government's action in effectuating the taking can be bifurcated from the government's obligation to pay for that taking in terms of the accrual of the taking claim. The only time that the government's refusal to pay starts the statute of limitations clock is when a statute establishes a requirement for government payment, which is not the case here.

The Supreme Court explored this very payment issue in *Soriano v. United States*, 352 U.S. 270, 77 S.Ct. 269, 1 L.Ed.2d 306 (1957):

> Petitioner asserts that his action did not accrue until the denial of the claim by the Army Claims Service. At the same time, he admits that the claim filed there was based on the alleged delivery of supplies, etc., on the promise of future payment.... The claim asserted in this proceeding ... is against the United States and based on the alleged taking of property without just compensation in violation of the Fifth Amendment. Petitioner would have us hold that this just compensation case could not be filed until after an administrative denial of his claim filed with the Army Claims Service. But, even if the claims were laid on the same theory and each was directed against the United States, Congress has made no such requirement. It has not so restricted the jurisdiction of the Court of Claims. Under the circumstances, for us to say that the exhaustion of administrative remedies in such case is a prerequisite to the jurisdiction of the Court of Claims would but "engraft (another) disability upon the statute" and thus frustrate the purpose of Congress. *Furthermore, it would be a limitless extension of the period of limitation that Congress expressly provided for the prosecution of claims against the Government in the Court of Claims. This we cannot do.*

*Id.* at 274–75, 77 S.Ct. 269 (internal citations and footnotes omitted) (emphasis added). Where, as here, there is no payment procedure delineated by statute or regulation, the government's refusal to pay is not relevant to the accrual of the taking claim.[3]

---

3. Based on the foregoing, plaintiffs' reliance on *North American Transp. & Trading Co. v. United States*, 53 Ct.Cl. 424, 1918 WL 1020 (1918), and *United States v. Clark*, 96 U.S. 37, 24 L.Ed. 696 (1877), to support their contention that the accrual of a taking claim can be bifurcated from the taking itself is misplaced, because those cases present very different factual circumstances. In *North American Transp.*, a U.S. military officer purported to seize the plaintiff's land via eminent domain on July 1, 1900, for the purpose of using it as an Army Base. However, the Claims Court found that the plaintiff's taking claim did not accrue until December 8, 1900, when the President of the United States issued an order officially setting aside the tract of land for military purposes, because the military officer "was not authorized to select any part of the public domain for [the purpose of siting an Army post]." The taking therefore did not occur until the government acted on December 8, 1900. *North American Transp.*, 53 Ct.Cl. at 428. *North Ameri-*

*can Transp.* deals with the question of when a government-authorized taking occurs, and not with an accrual of a taking claim that is temporally removed from the taking itself.

In *Clark*, the defendant was a federal disbursing officer who was sued by the United States for restoration of funds that had been stolen from his official safe. In the course of considering whether Clark was eligible to counter-sue for a credit from the treasury in the same amount after proving that indeed the funds had been stolen, the Supreme Court held that Mr. Clark's claim against the United States would not accrue until officers of the treasury had refused to recognize the lost sum as a valid credit in the settlement of the officer's accounts. Plaintiffs contend that this case demonstrates that the government's refusal to pay just compensation triggers the accrual of a taking claim. In fact, the case does not involve a taking claim, but deals with Clark's right to maintain a defense to a suit brought

From this court's perspective, the Federal Circuit's decision in *Alliance of Descendants of Texas* mandates dismissal of plaintiffs' case. The treaty at issue in that case was the 1941 Treaty with Mexico that provided that the United States and Mexico, "[R]eciprocally cancel, renounce and hereby declare satisfied all claims, of whatsoever nature, of nationals of each country against the Government of the other." When a group of descendants of Mexican nationals learned in 1989 that Mexico would not pay them compensation for the land grants they lost under the 1941 Treaty, the descendants sued the United States for taking the legal claims they would have had against the United States.

The Court of Federal Claims dismissed the suit on the grounds that the statute of limitations on the plaintiffs' claims had begun to run in 1941, when the Treaty extinguished the claimants' legal rights against the United States. In affirming the trial court, the Circuit explained, "claimants' takings claims thus accrued when the 1941 Treaty went into effect. At that point, the six-year clock began ticking. Because the 1941 Treaty went into force in April 1942, any takings challenge based upon it must necessarily have been filed no later than April 1948 under 28 U.S.C. § 2501." *Alliance of Descendants of Texas*, 37 F.3d at 1482. The Circuit continued, "Only in 1989 did Mexico finally decline to pay any compensation to claimants under the 1941 Treaty. This event, however, does not affect the accrual date of claimants' claim.... [The] 1941 [ratification of the Treaty] alone satisfies the axiomatic requirement that the United States itself must undertake the specific action alleged to take private property." *Id.*

Plaintiffs in the present case have failed to provide the court with any basis upon which to distinguish their case. As in *Alliance of Descendants of Texas*, here the actions of the United States that ostensibly gave rise to plaintiffs' taking claims occurred far more than six years ago—in the instant case, they arose in 1952 with the ratification of the San Francisco Peace Treaty. As such, following the precedent provided by *Alliance of Descendants of Texas*, plaintiffs had until 1958 to file their taking claim. Because they instead filed their taking claim more than forty years after the statute of limitations ran, this court has no choice but to dismiss their case for lack of jurisdiction.

In this connection, the court is mindful that the relevant statute of limitations can be tolled in proper circumstances. For example, the statute of limitations can be tolled where the government fraudulently or deliberately conceals material facts relevant to a plaintiff's claim so that the plaintiff is unaware of its existence and could not have discovered the basis of his claim. *See, e.g., Urie v. Thompson*, 337 U.S. 163, 169–70, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949) (holding that statute tolled if injury was "inherently unknowable"); *Holmberg v. Armbrecht*, 327 U.S. 392, 396–97, 66 S.Ct. 582, 90 L.Ed. 743 (1946) (holding that equitable tolling due to defendant's fraudulent concealment "is read into every federal statute of limitation"); *Welcker v. United States*, 752 F.2d 1577, 1580 (Fed.Cir.1985) ("the statute of limitations is tolled only so long as the plaintiff is unaware of the wrong committed").

Although plaintiffs do not argue that the statute of limitations should be tolled in this case, it is clear from the complaint that tolling is not appropriate in any event. There is nothing before the court to suggest that the United States endeavored to conceal any taking, or tried to mislead these plaintiffs. The terms of the 1951 San Francisco Peace Treaty are plain:

> Except as otherwise provided in the present Treaty, *the Allied Powers waive all reparations claims of the Allied Powers, other claims of the Allied Powers and their nationals* arising out of any actions taken by Japan and its nationals in the course of the prosecution of the war, and claims of the Allied Powers for direct military costs of occupation.

against him by the United States. The Court reasoned that, "so long as a party who has a cause of action delays to enforce it in a legal tribunal, so long will any legal defence to that action be protected from the bar of the lapse of time, provided it is not a cross-demand in the nature of an independent cause of action." *Clark*, 96 U.S. at 43. As such, *Clark* does not involve an affirmative taking claim against the United States in the first instance.

Treaty of Peace with Japan, Article 14(b) (emphasis added). Indeed, plaintiffs concede in their complaint that since 1951, the United States has consistently informed members of plaintiffs' putative class that their claims against Japan were waived by the Treaty. Therefore, to the extent that plaintiffs believed that ratification of the San Francisco Peace Treaty by the United States amounted to a taking, they had sufficient notice of the United States' position to file a takings claim. The plaintiffs' argument that the six-year limitations period places an "unfair burden" upon them is therefore unfounded.

Plaintiffs at one point suggest that use of the term "waive" in the Treaty text created an ambiguity, arguing that with this language, the United States in reality only "abandon[ed] its own right to espouse" the claims of its nationals, and did not extinguish those claims belonging to the plaintiffs.[4] This argument, however, provides no basis for tolling the statute of limitations: if, in fact, plaintiffs are free to maintain their claims against Japan given this use of the term "waive," then nothing was "taken" by the United States in the first place. Moreover, the *Japanese War Notes* case, which involves the same San Francisco Peace Treaty, makes it clear that plaintiffs' hope of recovery from Japan one day in the future is not enough to toll the statute of limitations for claims against the United States:

The bare possibility that some future international settlement—conceivably, decades in the future—*might* authorize plaintiff to collect his debt in full could not postpone the accrual of so specific a claim of present deprivation. This case is wholly unlike [other cases] in which the course of future events could reasonably be expected to have a direct effect on the claimant's rights. Here the future circumstance on which the plaintiff relies was a mere indefinite possibility which was too slight to arrest the accrual of the claim (if one existed).

*Japanese War Notes,* 373 F.2d at 358 (citing *Baer v. United States,* 164 Ct.Cl. 447, 451, 1964 WL 8527 (1964)).

## CONCLUSION

For all of the reasons stated above, the court **GRANTS** the government's November 13, 2001 motion to dismiss. Accordingly, the clerk is directed to **DISMISS** plaintiffs' taking action for want of jurisdiction pursuant to RCFC 12(b)(1). Additionally, plaintiffs' September 25, 2001 motion for class certification is **DISMISSED** as moot. Each party to bear its own costs.

4. For example, plaintiffs make a complex argument in their December 13, 2001 opposition to the government's motion to dismiss that under international law, a treaty of peace is *ipso facto* a settlement of all outstanding claims between the parties to the treaty, making the 1951 Treaty's statement that, "the Allied Powers waive all reparations claims of the Allied Powers, other claims of the Allied Powers and their nationals," both redundant and confusing. According to plaintiffs, this language "putting the governmental claims and the claims of their nationals on the same footing and in the same sentence can only be explained as an attempt to mislead the public into thinking that the [sic] both kinds of claims were waived and hence extinguished by the Treaty."