Marcia Fee **ACHENBACH**,
et al., **Plaintiffs**,

v.

The **UNITED STATES**, Defendant.

No. 02–894 C.

United States Court of Federal Claims.

June 19, 2003.

Anthony D'Amato, Chicago, IL, for plaintiffs. Susan M. Keegan and David G. Duggan, Chicago, IL, of counsel.

Kathryn A. Bleecker, which whom were Robert D. McCallum, Jr., Assistant Attorney General, and David M. Cohen, Director, U.S. Department of Justice, Washington, DC, for defendant. Jim Hergen, U.S. Department of State, Washington, DC, of counsel.

## OPINION

HEWITT, Judge.

Before the court is Defendant's Motion to Dismiss (Def.'s MTD). In its complaint, plaintiffs seek recovery under "the First Amendment to the United States Constitu-

tion, the Due Process and Takings Clauses of the Fifth Amendment, the Equal Protection Clause of the Fourteenth Amendment ... and the Constitution in its entirety as a social contract and common-defense compact" for injuries suffered on several Pacific islands at the hands of Japanese forces during World War II. Complaint (Compl.) at ¶¶ 3–4. Plaintiffs attribute this harm to the United States government because the government "deliberately left them in harm's way by preventing them from securing passage back to the United States despite the overwhelming probability if not the virtual certainty of Japanese attack." *Id.* at ¶ 3.

Defendant argues that this case should be dismissed because the court does not have jurisdiction to hear it. Def.'s MTD at 1. Specifically, defendant argues that plaintiffs' claims are barred by the six-year statute of limitations because these claims accrued, and plaintiffs knew they accrued, during World War II. *Id.* at 7–11. Defendant argues that there is no reason to toll the statute of limitations because the government did not conceal any information from plaintiffs and plaintiffs should have been aware of a claim well before this case was brought. *Id.* at 11–21; Defendant's Response to the Court's January 16, 2003 Order (Def.'s Supp.) at 4–9. Finally, defendant argues that plaintiffs' takings claim is barred because there is no allegation that the U.S. government took any property. Def.'s MTD at 25–27.

Plaintiffs' response to defendant's motion to dismiss is that the government has concealed information that could prove that the United States purposefully sacrificed plaintiffs in the Philippines, Guam, Wake and Midway Islands, in order to speed this nation's entry into World War II. Reply to Defendant's Motion to Dismiss (Pls.' Resp.) at 16–19. Plaintiff argues that the statute of limitations is tolled by the government's concealment. *Id.* at 19–20.

■ For the following reasons, Defendant's Motion to Dismiss is GRANTED.[1]

---

1. Defendant also argues that, with the exception of the takings claim, plaintiffs have not based their allegations on money-mandating Constitutional provisions. Def.'s MTD at 22–25. Plain-

tiffs concede that the takings claim is the only claim based on a money-mandating Constitutional provision, but argue that "[t]his [c]ourt is not barred from considering the relation between

## I. Background

On the eve of the Japanese attack on Pearl Harbor, plaintiffs were living in the Philippines, Guam, Wake, or Midway Islands. Compl. ¶ 1. At this time, the United States government was advising other American citizens in Asia to return to the United States, but citizens from the Philippines, Wake, Guam, and Midway were not provided this advice. *Id.* ¶ 22. While travel restrictions were lifted on cargo ships and loans were provided to ease evacuation from China and southeast Asia, U.S. citizens on the four islands were reassured that they were safe. *Id.* ¶ 23. But even as American citizens were being reassured, the government was ordering home military wives and dependents. *Id.* ¶ 27. Beginning in 1939, the government put restrictions on the ability of U.S. citizens in the Philippines to travel, taking their passports and, beginning in 1941, barring them from departing or entering any territory of the United States without a valid passport. *Id.* ¶¶ 33–34. These policies had tragic consequences when, eight hours after Pearl Harbor was attacked, the Japanese military invaded the Philippines. *Id.* ¶ 73. Plaintiffs describe their experiences in the subsequent occupation:

> The claimants were brutalized, injured, starved, or killed by the invading Japanese armed forces. Their homes and property were taken away from them and confiscated .... Most of them were interned in prison camps run by Japan in conditions of near-starvation, and a number of them starved to death.

*Id.* ¶ 77.

After the war, this nation understandably wanted to learn what went wrong on December 7, 1941. While most of the focus of inquiry was placed on the attack on Pearl Harbor, the Philippines were not forgotten. *See id.* ¶ 71. While testifying before a Joint Committee of Congress, former Secretary of War Henry L. Stimson noted that "we all felt in Washington that the first and most likely danger was an attack on the Philippines and that such an attack would be most difficult to meet." *Id.* ¶ 71 (quoting from Hearings Before the Joint Committee on the Investigation of the Pearl Harbor Attack, Part 11, 79th Cong., 5425–26 (1946) (statement of Henry L. Stimson, former Secretary of War) (1946 Pearl Harbor Hearings) (excerpted in Appendix to Complaint (Pls.' App.) 29, at 5425)).

Several books have been written about a possible "conspiracy" to allow the attack on Pearl Harbor to force American entry into World War II, and the Philippines were not omitted from these studies. *See* Def.'s Supp. at 4–7. And plaintiffs candidly acknowledge that they received "token compensation" from the United States government in 1951 "because they had been urged to stay" in the Philippines, Guam, Midway, and Wake Islands. Affidavit of Marcia Fee Achenbach attached to Plaintiff's Response to the Court's Order of January 16, 2003 (Achenbach Decl.) ¶ 6. This is not the first lawsuit based on these tragic facts. This court has already dismissed a claim based on a taking alleged to have occurred when the United States signed the Treaty of Peace with Japan in 1951. *Hair v. United States*, 52 Fed.Cl. 279 (2002), *appeal pending*, No. 02–5115 (Fed.Cir.).

## II. Discussion

### A. Motion to Dismiss Standard

Rule 12(b)(6) of the Court of Federal Claims (RCFC) governs dismissal for "failure to state a claim upon which relief can be granted." RCFC 12(b)(6). Under RCFC 12(b)(6), the court must accept as true the facts alleged in the complaint, *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 633,

---

these [other alleged Constitutional] violations and plaintiffs' claim for 'just' compensation." Pls.' Resp. at 24. The court disagrees. The court may only entertain actions based on some substantive provision of law, regulation, or the Constitution which fairly can be construed as mandating compensation. *United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980). As defendant has correctly pointed out, the right to travel under the First Amendment, the due process clauses of the Fifth and Fourteenth Amendments, and the equal protection clause of the Fourteenth Amendment are not money-mandating. Def.'s MTD at 23–24. Accordingly, the court does not have jurisdiction to hear these claims. Defendant's Motion to Dismiss as to Counts I–V of the Complaint is GRANTED.

119 S.Ct. 1661, 143 L.Ed.2d 839 (1999), and must construe all reasonable inferences in favor of the non-movant, *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed.Cir. 2001). A court must grant the motion "when the facts asserted by the plaintiff do not entitle him to a legal remedy." *Boyle v. United States*, 200 F.3d 1369, 1372 (Fed.Cir. 2000). RCFC 12(b)(6) provides that where such a motion is filed and "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in RCFC 56." RCFC 12(b)(6); *see also Rotec Indus., Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1250 (Fed.Cir. 2000).

### B. Statute of Limitations

■ Defendant argues that this case was brought well after the statute of limitations has run. Def.'s MTD at 7–21. It is clear that "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501. Generally, a cause of action accrues when a plaintiff is "armed with the facts about the harm done to him." *United States v. Kubrick*, 444 U.S. 111, 123, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979). Specifically, a takings claim accrues "when the taking occurs." *Alliance of Descendants of Tex. Land Grants v. United States*, 37 F.3d 1478, 1481 (Fed.Cir.1994).

The six-year statute of limitations has been found to be a "condition" upon the sovereign's consent to suit. *Soriano v. United States*, 352 U.S. 270, 276, 77 S.Ct. 269, 1 L.Ed.2d 306 (1957). Equitable tolling is permitted, however, where plaintiff "show[s] either 'that defendant has concealed its acts with the result that plaintiff was unaware of their existence or it must show that its injury was "inherently unknowable" at the accrual date.'" *Alliance of Descendants of Tex.*, 37 F.3d at 1482 (quoting *Japanese War Notes Claimants Ass'n of the Philippines, Inc. v. United States*, 178 Ct.Cl. 630, 373 F.2d 356, 359 (1967), *cert. denied*, 389 U.S. 971, 88 S.Ct. 466, 19 L.Ed.2d 461 (1967)); *see also Hair*, 52 Fed.Cl. at 284.

The "events giving rise to [plaintiffs'] claims occurred between December 7, 1941 and September 2, 1945." Def.'s MTD at 8 (citing Compl. ¶ 77). The court agrees with defendant that "those plaintiffs who were internees were well aware of the harm done to them and their families by the Japanese during that time." *Id.* at 8. The Complaint in this case was filed on July 29, 2002. Because the events complained of occurred well before July 29, 1996, the date six years before the complaint was filed, defendant argues that the statute of limitations bars this suit. *Id.* at 10.

Plaintiffs recognize that their injuries occurred during the 1941–45 Japanese occupation, but contend that the statute of limitations cannot have run here because defendant concealed information that shows it was responsible for the injuries inflicted by the Japanese during the war. *See* Pls.' Resp. at 20. Plaintiffs argue that while they "were painfully aware of the brutalities, tortures, and killings inflicted upon them by the Japanese in the internment camps in the Philippines ... [,] [they] did not know that the United States allowed the injuries to happen by deliberately not evacuating them from the Philippines in contrast to the way that other American citizens in Thailand, Japan, China, Hong Kong, Macao, and French Indonesia had been duly warned and evacuated." *Id.* at 4. Plaintiffs further contend that

> in addition to the circumstantial evidence that has been outlined in the Complaint and can be tested at trial, there is a "smoking gun" in the possession of the defendant that proves our theory. This evidence is contained in the transcripts of the Roosevelt–Churchill transatlantic telephone conversations of June through December, 1941. These transcripts have been kept secret by the defendant despite the inquiries and requests for information from many historians.

*Id.* at 18. According to plaintiffs, this evidence would provide grounds to reject defendant's motion to dismiss "because the defendant is concealing the very information that not only proves the plaintiffs' claims but also

reveals the defendant's own responsibility for the plaintiffs' injuries." *Id.* at 19. Plaintiff argues that the lack of scholarship on civilians in the Philippines "prove[s] [plaintiffs'] thesis that the government has successfully concealed its intention to deliberately sacrifice the American civilians in the Philippines in order to rally the American public to go to war against Japan." Plaintiff[s'] Response to the Court's Order of January 16, 2003 (Pls.' Supp.) at 5. *See also* Affidavit of Anthony D'Amato attached to Pls.' Supp. ¶ 10 (stating that prior to 2000, he did not recall any mention of American civilians trapped in the Philippines in all the books and articles he had read about World War II).

Defendant "takes strong exception to plaintiffs' theory." Def.'s MTD at 14. According to defendant, "[p]laintiffs' bald allegations of the Government's misdeeds, coupled with their illogical assertion that the lack of evidence is evidence of the Government's complicity, is insufficient to allege the affirmative, serious misconduct required to invoke equitable tolling or estoppel." *Id.* at 15. Plaintiffs' allegations are not enough to show "'deceptive or fraudulent concealment . . . that induces justifiable reliance and delay in bringing an action.'" Reply to Plaintiffs' Response to Defendant's Motion to Dismiss (Def.'s Reply) at 9 (quoting *Huntzinger v. United States*, 9 Cl.Ct. 90, 95 (1985)). Defendant further argues that even if the statute of limitations was tolled for some period, plaintiffs still had sufficient information to bring a case against the United States well before it did. Def.'s MTD at 16 (citing *Japanese War Notes*, 373 F.2d at 359).

It is especially difficult to reconcile plaintiffs' claim of concealment with the public record created during Congressional hearings in 1946 and 1947. It is clear that plaintiffs are aware of these materials because excerpts are attached to their Complaint. *See, e.g.,* Pls.' App. 10, 29. In 1946, an internee demonstrated in his testimony a keen awareness of the possible foreign policy objectives served by a continuing civilian presence on the Philippines:

> Although it is true that some individuals could have, and if duly warned would have,

withdrawn and sought safety in the homeland, it is a positive fact that the American community in the Philippines could not have been liquidated without a complete reversal of the whole American policy in the Philippines and a defeat of the program under which the aggression build-up of the enemy was met with a solid front. The whole official attitude in the Philippine Islands—as revealed in Army, Navy, and civil government offices—was that public morale must be maintained and that the Americans, collectively and individually, must set an example to the Filipinos, an example to give no encouragement to the enemy through admission of weakness or unwillingness or unreadiness to meet any emergency which possibly might arise.

Hearing on H.R. 873, H.R. 1823, H.R. 1000 and H.R. 2823 Before the House Committee on Interstate and Foreign Commerce, 80th Cong., 90–91 (1947) (statement of Theodore D. Stevenson, M.D., Media, Pa.)[2] (1947 Hearing) (excerpted in Pls.' App. 10 at 90–91).

Plaintiffs also quote the testimony of former Secretary of War Henry L. Stimson as evidence that the United States sought to have Japan fire the war's first shot in the Pacific:

> One problem troubled us very much. If you know that your enemy is going to strike you, it is not usually wise to wait until he gets the jump on you by taking the initiative. In spite of the risk involved, however, in letting the Japanese fire the first shot, we realized that in order to have the full support of the American people it was desirable to make sure that the Japanese be the ones to do this so that there should remain no doubt in anyone's mind as to who were the aggressors.

1946 Pearl Harbor Hearings at 5421 (excerpted in Pls.' App. 29 at 5421).

What plaintiffs now complain of was aptly summarized by Dr. Stevenson in his 1947 testimony:

> We of the ill-fated group of civilian Americans caught and tortured by a successful enemy force of aggression in the Philip-

---

**2.** It appears that the Estate of Dr. Stevenson is a plaintiff in this action. Pls.' App. 1 at 15.

pines now find that in effect we were expendables. We do not presume to say that there was any cold and calculated plan so describing us officially, but the job that fell to us resolved itself into just that. Whatever might be our fate in the ultimate course of the war, for all practical purposes in the early phases, in the period of enemy successes, we simply had to be written off in order that the long-range program for the eventual defeat of the then victorious enemy could be carried out.

1947 Hearing at 90 (excerpted in Pls.' App. 10 at 90). The only salient difference between Dr. Stevenson's testimony and plaintiffs' claim is plaintiffs' argument that evidence exists to show that President Roosevelt conspired in some fashion to injure plaintiffs. Pls.' Resp. at 18. On the same point, Dr. Stevenson had said, "We do not presume to say that there was any cold and calculated plan ... describing us officially [as expendables] ...." 1947 Hearing at 90 (excerpted in Pls.' App. 10 at 90). Plaintiffs' additional allegation of a "cold and calculated plan" does not in the court's view add in any material way to their takings claim. Plaintiffs have, albeit reluctantly, acknowledged that the President's action in the conduct of pre-World War II policy in the Pacific, however history might finally view it, was "authorized by his office." [3] Tr. at 11.

Plaintiffs concluded their oral argument with the claim that "[t]hey had no idea ... [t]hat they were the sacrificial persons." Tr. at 60. But Dr. Stevenson's testimony, in 1947, was that "in effect we were expendables." 1947 Hearing at 90 (excerpted in Pls.' App. 10). The court does not believe that the government's role in the plaintiffs' suffering was concealed in any way that would entitle plaintiffs to an equitable tolling of the statute of limitations.

Plaintiffs also acknowledge receipt of payments from the United States Treasury in 1951. Achenbach Decl. ¶ 6. A newspaper article which plaintiffs identify as a clipping from the New York Daily News of August 15, 1950 describes the payments from the War Claims Commission. App. A to Achenbach Decl. The article noted that the State Department had "encouraged war-jittery Americans [to rema]in in the Far East in 1941 for fear of injuring Philippine moral." *Id.* (partially legible copy; material in brackets supplied). The article goes on to explain the payments:

> To those adult civilians caught in the rush of war, the commission [is p]aying $60 for each month spent in internment camps. Children are [p]aid at the rate of $25 a month.

> Americans captured in China, Japan, and Europe get nothing, bec[cau]se Uncle Sam figures that he gave them ample warning to return [hom]e before the outbreak of World War II. But those stranded in the [Phi]ilippines, Guam, Midway and Wake Island will draw the token com[pen-]sation because they had been urged to stay.

> . . . .

> Hundreds of these internees have testified that when they sought [to bo]ok passage home, State Department representatives discouraged [and] occasionally blocked it for fear of upsetting native morale. Like good soldiers, they paid with their fortunes and their health.

Ruth Montgomery, *Capital Circus*, N.Y. Daily News, Aug. 15, 1950 (App. A to Achenbach Decl.) (partially legible copy; material in brackets supplied). According to plaintiffs' own evidence, many persons in plaintiffs' position, it appears, knew they had been injured, how, and by whom.

### III. Conclusion

While the court is mindful of the suffering plaintiffs endured in the Philippines, Guam, Wake and Midway islands, this court does

---

**3.** In order for an act of the government to be remediable as a taking, it must be " 'authorized,' i.e., whether the alleged invasion of property rights is chargeable to the government or is an act committed by a government agent acting *ultra vires.*" *Del–Rio Drilling Programs, Inc. v. United States,* 146 F.3d 1358, 1362 (Fed.Cir. 1998). Absent the acknowledgment, Tr. at 11, plaintiff would lack one of the elements of its claim.

not have jurisdiction to hear their case. Because plaintiffs should have known that they had a claim against defendant prior to July 29, 1996, the date six years before their Complaint was filed, their claim is time-barred. Defendant's Motion to Dismiss is GRANTED and the Clerk of the Court shall dismiss the Complaint.[4] No costs.

IT IS SO ORDERED.

4. Defendant also argues that because the property here was taken by Japanese forces, rather than the United States government, the court does not have subject matter jurisdiction of plaintiffs' takings claim. Def.'s MTD at 25–26. As defendant correctly points out, the focus of a takings inquiry where a foreign government's actions are involved is "whether the United States' involvement was sufficiently direct and substantial to warrant its responsibility under the [F]ifth [A]mendment." Def.'s Reply at 16–17 (quoting *Langenegger v. United States*, 756 F.2d 1565, 1572 (Fed.Cir.1985)). Plaintiffs reply that they have stated a valid takings claim because "Japan was the proximate instrument of the plaintiffs' injuries [which were] the foreseeable result of the defendant's decision to prevent the plaintiffs from leaving the Philippines." Pls.' Resp. at 23.

Defendant also argues that, even if the court found that the taking was the foreseeable result of the government's policy to prevent plaintiffs from leaving the Philippines, the "taking claim would involve the court in the resolution of a political question." Def.'s Reply at 17 (quoting *Belk v. United States*, 858 F.2d 706, 710 (Fed.Cir. 1988)).

Given the court's resolution of the statute of limitations issue, this opinion does not reach these additional points of disagreement between the parties.